UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

....................................................................... X

DIANE T. CLARKE, ILANA KOPMAR, ISAAC
ALTMAN, and DAVID ROSENFELD,

                              Plaintiffs,

              -against-

THE ASSOCIATION OF LEGAL AID
ATTORNEYS, AMALGAMATED LOCAL UNION
2325 OF THE INTERNATIONAL UNION, UNITED
AUTOMOBILE AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA (UAW), AFL-CIO, LISA OHTA, BRET J.
TAYLOR, JEREMY BUNYANER, EMILY C.
EATON, MARTYNA KAZNOWSKI, GILLIAN R.
KRESS, JOANA CALIN, PUJA PAUL,

                            Defendants.

....................................................................... X

Case No. 2:23-cv-08869
(NJC)(ARL)


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION
TO DISSOLVE THE TEMPORARY RESTRAINING ORDER
<u>AND IN SUPPORT OF PRELIMINARY INJUNCTION</u>**

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
Telephone: (212) 848-4000

# Table of Contents

**Page**

PRELIMINARY STATEMENT ..................................................................................1

BACKGROUND ....................................................................................................5

ARGUMENT .........................................................................................................8

I.      Plaintiffs' Injuries Are Quintessentially Irreparable ............................................8

    A.      The Resolution Will Harm Plaintiffs' Ability To Satisfy The Duties They Owe To Their Clients Pursuant To Gideon v. Wainright ........................................9

    B.      The Resolution Will Irretrievably Damage Plaintiffs' Professional And Personal Reputations ..................................................................................11

II.     Plaintiffs' Claims Are Likely To Succeed On The Merits ................................12

    A.      Defendants Breached The ALAA Constitution And Bylaws ...............................12

    B.      Defendants Breached Their Duty of Fair Representation....................................17

III.    The Balance of Hardships And Public Interest Heavily Favor Injunctive Relief.............19

IV.     The Injunctive Relief Is Consistent With The First Amendment ......................20

    A.      There Is No Prior Restraint .....................................................................21

    B.      There Is No Free Speech Violation..............................................................22

    C.      The Resolution Would Improperly Compel Speech ...............................................23

CONCLUSION....................................................................................................24

# TABLE OF AUTHORITIES

<b>Page(s)</b>

**Cases**

*242-44 East 77th Street, LLC v Greater N. Y. Mut. Ins. Co.*,
31 A.D.3d 100 (1st Dep't 2006) ...................................................13, 14

*Breininger v. Sheet Metal Workers Int'l. Ass'n Local Union No. 6*,
493 U.S. 67 (1989)...........................................................................17, 18

*Broker Genius, Inc. v. Zalta*,
280 F. Supp. 3d 495 (S.D.N.Y. 2017)....................................................8

*Brown v. Sombrotto*,
523 F. Supp. 127 (S.D.N.Y. 1981).......................................................14

*Cablevision Sys. Corp. v. Commc'ns Workers of Am. Dist.*
*1*,131 A.D.3d 1082 (2d Dep't 2015)..................................................17

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
598 F.3d 30 (2d Cir. 2010)...............................................................8, 19

*Commonwealth v. Dew*,
210 N.E.3d 904 (Mass. 2023) ..............................................................10

*Ellis v. Harrison*,
947 F.3d 555 (9th Cir. 2020) (en banc) (Nguyen, C.J., concurring).........9

*Evergreen Ass'n, Inc. v. City of New York*,
740 F.3d 233 (2d Cir. 2014).................................................................12

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009)..................................................................9

*Feinerman v. Bernardi*,
558 F. Supp. 2d 36 (D.D.C. 2008) ........................................................12

*Gideon v. Wainwright*,
372 U.S. 335 (1963)................................................................... *passim*

*Matter of Giuliani*,
197 A.D.3d 1 (1st Dep't 2021) .............................................................23

*Goat Fashion Ltd. v. 1661, Inc.*,
No. 18-cv-11045, 2020 WL 5758917 (S.D.N.Y. Sept. 28, 2020) ...........20

*Grant v. Commc'ns Workers of Am., Local 1101*,
  2017 WL 6000605 (S.D.N.Y. Dec. 1, 2017) .........................................................................15

*Guettlein v. U.S. Merch. Marine Acad.*,
  577 F. Supp. 3d 96 (E.D.N.Y. 2021) .....................................................................................8

*Hoblock v. Albany Cnty. Bd. of Elections*,
  422 F.3d 77 (2d Cir. 2005)..................................................................................................10

*Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*,
  968 F.2d 286 (2d Cir. 1992).................................................................................................22

*Krispy Kreme Doughnut Corp. v. Satellite Donuts*,
  725 F. Supp. 2d 389 (S.D.N.Y. 2010)............................................................................19, 20

*Loekle v. Hansen*,
  551 F. Supp. 74 (S.D.N.Y. 1982)..........................................................................................22

*Madden v. Atkins*,
  4 N.Y.2d 283, 294–6 (1958) ................................................................................................16

*Martin v. Curran*,
  303 N.Y. 276 (1951) .......................................................................................................16, 17

*Mass. L. Reform Inst. v. Legal Servs. Corp.*,
  581 F. Supp. 1179 (D.D.C. 1984), *aff'd*, 737 F.2d 1206 (D.C. Cir. 1984)............................20

*Mayes v. Local 106, Intern. Union of Operating Eng'rs*,
  739 F. Supp. 744 (N.D.N.Y. 1990)........................................................................................15

*Pacific Gas and Electric Co. v. Public Utilities Commission of California*,
  475 U.S. 1 (1986)....................................................................................................................3

*Performing Arts Ctr. Of Suffolk Cnty. v. Actor's Equity Ass'n*,
  2022 WL 16755284 (E.D.N.Y. Aug. 25, 2022).....................................................................16

*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999).................................................................................................20

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010).....................................................................................................8

*Spanski Enters., Inc. v. Telewizja Polska S.A.*,
  832 F. App'x 723 (2d Cir. 2020) ..........................................................................................20

*Stein v. Lee Eye Ctr., Inc.*,
  2021 WL 5770212 (W.D. Pa. Dec. 6, 2021)..........................................................................11

*U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital,*
   38 N.Y.3d 169 (N.Y. 2022) ............................................................................13

*Vans, Inc. v. MSCHF Prod. Studio, Inc.,*
   2023 WL 8385065 (2d Cir. Dec. 5, 2023) .........................................................21

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ..............................................................................................8

*Wooddell v. Int'l Bhd. of Elec. Workers, Local 71,*
   502 U.S. 93 (1991) ...........................................................................................14

**Other Authorities**

LMRA Section 301 ...................................................................................................14

N.Y. Gen. Ass'ns Law § 13 .....................................................................................16

Nassau County Law § 722(2) .....................................................................................9

ALAA "Rank and File Members" ..............................................................................4

*ADL Center on Extremism notes nearly 400-percent increase in preliminary*
*   antisemitic incidents reported year-over-year* (Oct. 25, 2023), available at
   https://www.adl.org/resources/press-release/adl-records-dramatic-increase-us-
   antisemitic-incidents-following-oct-7 (last visited Dec. 12, 2023) .......................11

*Maj.Leader Schumer Delivers Major Address on Antisemitism on the Senate*
*   Floor* (Nov. 29, 2023), available at
   https://www.democrats.senate.gov/newsroom/press-releases/majority-leader-
   schumer-delivers-major-address-on-antisemitism-on-the-senate-floor (last
   visited Dec. 12, 2022) ........................................................................................4

*Statement for Resolution from ALAA* (Nov. 15, 2023), available at
   https://legalaidnyc.org/wp-content/uploads/2023/11/Statement-on-Resolution-
   from-ALAA-UAW-Local-2325.pdf .....................................................................2

Plaintiffs file this Memorandum of Law in Opposition to Defendants' Motion to Dissolve the TRO and In Support of Preliminary Injunction. Plaintiffs respectfully request that the Court issue a preliminary injunction to maintain the injunctive relief pursuant to the TRO issued by the New York State court and preclude the submission of the Resolution by the ALAA for a vote pending a determination on Plaintiffs' claims.

## PRELIMINARY STATEMENT

Plaintiffs in this case are legal aid attorneys in Nassau County. They use their skills and training as lawyers to help those who need it most. They are dedicated to representing indigent individuals and deeply committed to the principle articulated by the Supreme Court in *Gideon v. Wainwright*, 372 U.S. 335 (1963), pursuant to the Sixth Amendment of the Constitution, that "any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him."

Plaintiffs are members of a union, Defendant Association of Legal Aid Attorneys, Amalgamated Local Union 2325 of the UAW ("ALAA" or the "Union"), which is supposed to represent all legal aid attorneys in New York City and certain surrounding areas, including Nassau County. Increasingly, Plaintiffs have been subjected to hostility in the form of anti-Israel and antisemitic rhetoric on Union platforms and through Union messaging systems.

But this case is about a cynical effort by the Union to compel Plaintiffs—and other members in the minority at the ALAA—to effectively adopt *and be publicly associated with* some of that anti-Israel and antisemitic rhetoric as their own. That is because the ALAA is attempting to pass a resolution (the "Resolution") related to Israel that the Legal Aid Society of New York

has referred to as "laden with coded antisemitic language and thinly veiled calls for the destruction of the State of Israel" and "divisive and hurtful."[1]

The ALAA plans to issue the Resolution "by the Association of Legal Aid Attorneys, United Auto Workers Local 2325" in the name of its members, the "legal workers, including attorneys, paralegals, legal advocates, social workers, interpreters, investigators, administrative staff and more" without any qualifications.  In other words, the ALAA will present the Resolution as a purported communication by all legal aid attorneys in the Union, including those who vote against it and do not want to be associated with it.

Defendants seek to justify this gross misrepresentation by contending that they were asked to bring the Resolution to the membership for adoption and all members will have a vote.  There is no dispute that if Defendants are permitted to proceed and a majority votes in favor, Defendants will publish the Resolution on behalf of all ALAA members, regardless of how they voted.  But the preference of a majority of ALAA members as expressed in a vote is not legitimate justification to compel the members in the minority—to whom the Defendants owe exactly the same duties as the majority—to issue a political resolution the minority members view as discriminatory and in conflict with their responsibilities as legal aid attorneys.

Actually, no legitimate justification has been provided by Defendants.  For starters, the Resolution has nothing to do with the Union's central purpose, which is to serve as a representative for all legal aid attorneys employed in New York and surrounding counties in the collective bargaining process.  Defendants have no authority under the ALAA Bylaws to submit for a vote, adopt, and issue the Resolution putatively on behalf of all members.  Nor can Defendants engage

---

[1]     The Legal Aid Society, Statement for Resolution from ALAA (Nov. 15, 2023), available at  https://legalaidnyc.org/wp-content/uploads/2023/11/Statement-on-Resolution-from-ALAA-UAW-Local-2325.pdf (last visited Dec. 12, 2023).

in any conduct that is arbitrary or discriminatory. Plainly, Defendants' attempts to issue the Resolution breach the Bylaws and Defendants' duty of fair representation. And there is nothing preventing any of the individual ALAA members—officer Defendants and others—from making whatever statements they are inclined to make, whether individually or collectively, on their own behalf. But they cannot do so in the name of the minority members who do not agree, much less for the purpose of magnifying a divisive or discriminatory message by giving it the false imprimatur of all legal aid attorneys in the Union.

*This case is not about Defendants' free speech rights; it is about the right of Plaintiffs to avoid being compelled by Defendants—in breach of Defendants' obligations—to participate in speech Plaintiffs find discriminatory and that will compromise their professional responsibilities to indigent defendants.* As the Supreme Court has made abundantly and repeatedly clear, including in *Pacific Gas and Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 11 (1986): "There is necessarily . . . a concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect."

Defendants have not once offered any explanation for why the ALAA is seeking to publish this particular message as a membership resolution rather than simply issuing a statement by the ALAA leadership or whichever members choose to sign on. When Judge Felice J. Muraca, Supreme Court of New York, Nassau County, held the hearing on extending the TRO enjoining the vote on the Resolution, he asked Defendants' counsel: "By the way, has this organization, this Union, ever issued any sort of resolution on any issue . . . . outside the function of the general duties of the Union, which is collective bargaining?"

It turns out that in the last 50 years, there appears to have been only one such ALAA membership resolution, period: "A Resolution on Divestment from Israel Bonds." If brought to

a membership vote and adopted, the Resolution would thus be the second. Indeed, in an ostensible "Digest" of statements issued by the ALAA and its executives over the last half century (circulated recently by supporters of the Resolution apparently to show in response that it is not unique or discriminatory), a group of supposed ALAA "Rank and File Members" purported to identify more than two dozen "Statements and Positions on Matters of Public Concern." But only one is listed as an ALAA membership resolution. In other words, ALAA membership resolutions are reserved in practice for condemnation of Israel.

Senator Charles Schumer recently explained in a landmark speech on antisemitism:

To Jewish people, the double standard has been ever present and is at the root of antisemitism. The double standard is very simple:

What is good for everybody, is never good for the Jew. When it comes time to assign blame for some problem, the Jew is always the first target.

And in recent decades, this double standard has manifested itself in the way much of the world treats Israel differently than anybody else.[2]

The Resolution is discriminatory, arbitrary, and in bad faith. It thus violates the Union's duty of fair representation and its own Bylaws.

And the harm is real and imminent. Compelling Plaintiffs to publicly adopt a diatribe attacking Israel that, in their view, is antisemitic, is plainly injurious to Plaintiffs—three of whom are Jewish. Defendants' counsel has even acknowledged in candor that it seems clear "that plaintiff[]s experience deep discomfort associated with" the statements in the Resolution.

---

[2] *Majority Leader Schumer Delivers Major Address on Antisemitism on the Senate Floor* (Nov. 29, 2023), available at https://www.democrats.senate.gov/newsroom/press-releases/majority-leader-schumer-delivers-major-address-on-antisemitism-on-the-senate-floor (last visited Dec. 12, 2022). Unless otherwise indicated herein, internal citations and quotation marks are omitted.

But the harm goes far beyond that. The Court need not find today that the Resolution is antisemitic in order to conclude that its publication in the name of all members must be enjoined.

Plaintiffs are lawyers who represent indigent defendants. The sine qua non of their profession—and the organizations they work for—is that they strive to avoid all appearances of partiality or conflicts so that they may zealously represent their clients, regardless of race, ethnicity, or religion. The Resolution will materially impair plaintiffs' ability to act as *Gideon* lawyers.

When confronted with this reality at the same hearing, Defendants' counsel had this to say: "[T]his is a voluntary organization. Plaintiffs are free to resign membership." Indeed, Defendants' counsel even repeated this: "If a vote occurs and the resolution is approved, as I said, plaintiffs can resign from union membership."

And perhaps that is the point. The Resolution, which incants the slur of "ethnic cleansing" no fewer than four times, may succeed in cleansing the ranks of the ALAA of an apparently disfavored minority.

## BACKGROUND

In the context of the ongoing war in Gaza in the wake of the Hamas terrorist attack in Israel on October 7, 2023, Plaintiffs' union, the ALAA, sought in November 2023 to issue a "Resolution Calling for a Ceasefire in Gaza, an End to the Israeli Occupation of Palestine, and Support for Workers' Political Speech" (the "Resolution"). (*See* ECF No. 6-4.)

The Resolution represents that the members of the ALAA "stand for human rights," but it has no condemnation for the brutal gang rapes of women and girls, torture, mass murder, kidnapping, and other atrocities committed against Israelis and others in Israel on October 7 by Hamas. (*See generally* Resolution.) Instead, as the Legal Aid Society of New York has characterized it, "[t]he resolution is laden with coded antisemitic language and thinly veiled calls

for the destruction of the State of Israel" and is "divisive and hurtful."[3]  The Legal Aid Society of Nassau County ("NCLAS") conveyed a similar characterization and made it clear that the Resolution "does not represent the values or mission of our office."  (NCLAS Statement Opposing the Resolution, Ex. 4 to Kahn Decl.)

Plaintiffs Diane T. Clarke, Ilana Kopmar, Isaac Altman, and David Rosenfeld, who are legal aid attorneys at NCLAS and members of the ALAA, serve as public defenders for indigent clients in Nassau County.  Regardless of any particular person's perception of the Resolution, there is no dispute that Plaintiffs view the content as antisemitic and discriminatory.  (*See also* Defs.' Mem. in Supp. of Mot. ("Br.") at 15 (conceding the Resolution may offend some ALAA members, including Plaintiffs).)

Nevertheless, the ALAA is attempting to compel Plaintiffs to adopt that speech as their own.  The Resolution is to be voted on, adopted, and issued by the "legal workers, including attorneys, paralegals, legal advocates, social workers, interpreters, investigators, administrative staff," and other members of the ALAA.  (Resolution at 1.)

If passed, the Resolution appears to be just the second resolution unrelated to collective bargaining in approximately the last 50 years that the ALAA membership will have adopted.  The other, purportedly adopted on July 22, 2022, also espouses anti-Israel sentiment, and calls for the divestment of Israeli bonds purportedly "in support of Palestinian liberation from Israeli apartheid."  (Digest of Select Statements and Positions on Matters of Public Concern by ALAA ("Digest"), Ex. A to Clarke Decl.)

On November 13, 2023, the ALAA circulated to its members a copy of the Resolution in advance of a November 14, 2023 ALAA meeting.  (ECF No. 6-3.)  At that meeting, the Bronx

---

[3]        *See supra* note 1.

Defenders Chapter moved to present the Resolution for a full membership vote on November 17, 2023. (*See* Br. at 3; *see also* Verified Compl. ("Compl.") ¶ 4, ECF No. 1-2.) The ALAA Joint Council purportedly voted on and approved the motion by a count of 108 in favor and 13 against, with 8 abstentions. (*See* Br. at 3.)

On November 16, 2023, Plaintiffs filed suit in New York State court to enjoin the ALAA membership vote. (*See generally* Compl.) Plaintiffs assert the vote and adoption of the Resolution constitute violations by Defendants of the duty to provide fair representation to *all* ALAA members, including Plaintiffs, as well as several provisions of the ALAA Bylaws in breach of contract. (*Id.* ¶¶ 17–27.) Plaintiffs also contemporaneously filed an Order to Show Cause seeking entry of a temporary restraining order, providing that, pending the hearing and determination of the action, Defendants are restrained and enjoined from distributing the Resolution for a vote to the membership of the ALAA or otherwise causing it to be distributed or disseminated to the membership or putting it to a vote by such members ("TRO"). (ECF No. 6-6.)

The presiding Judge, the Honorable Felice J. Muraca, granted that application on November 17, 2023, and ordered that the parties file additional briefing and appear for oral argument on November 21, 2023 to address whether the TRO should be extended. (*See* ECF No. 6-6.) Judge Muraca subsequently extended the TRO.

Defendants removed the case to federal court on December 1, 2023. (Not. of Removal, ECF No. 1.) On December 6, 2023, weeks after the extension of the TRO, Defendants filed the instant Motion to Dissolve the TRO ("Motion"). (*See* ECF No. 5.)

Plaintiffs respectfully request that this Court issue a preliminary injunction to maintain the injunctive relief and preclude the submission of the Resolution by the ALAA for a vote in order to protect Plaintiffs' rights pending the determination on Plaintiffs' claims.

**ARGUMENT**

In the Second Circuit, "the standard for entry of a temporary restraining order is the same as for a preliminary injunction." *Guettlein v. U.S. Merch. Marine Acad.*, 577 F. Supp. 3d 96, 101 (E.D.N.Y. 2021). A preliminary injunction should issue where, as here, the party seeking such relief demonstrates: (i) there is a likelihood the party will suffer irreparable harm absent the issuance of preliminary relief; (ii) the party has a likelihood of success on the merits; (iii) the balance of hardships tips in the party's favor; and (iv) the public interest is not disserved by the requested relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Salinger v. Colting*, 607 F.3d 68, 75 (2d Cir. 2010).

Moreover, even if likelihood of success on the merits cannot be established, an injunction may nonetheless issue if there are "sufficiently serious questions going to the merits to make them a fair ground for litigation," and the "balance of hardships tip[s] decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). "[T]his alternative approach empowers district courts to grant injunctions" even when they "'cannot determine with certainty' at the preliminary injunction phase that the moving party is 'more likely than not to prevail on the merits.'" *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 524 (S.D.N.Y. 2017) (quoting *Citigroup Glob. Mkts.*, 598 F.3d at 35).

## I. Plaintiffs' Injuries Are Quintessentially Irreparable

The Second Circuit has explained that "[t]o satisfy the irreparable harm requirement, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559

F.3d 110, 118 (2d Cir. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). That is the type of harm that Plaintiffs are facing here.

A. **The Resolution Will Harm Plaintiffs' Ability To Satisfy The Duties They Owe To Their Clients Pursuant To *Gideon v. Wainright***

Defendants entirely ignore that Plaintiffs are uniquely situated in that Plaintiffs provide *constitutionally-mandated* representation to indigent and other qualifying clients of all backgrounds, races, religions, ethnicities, and national origins. (Compl. ¶¶ 7–11.) Plaintiffs' clients do not select Plaintiffs as their attorneys, but rather Plaintiffs are appointed consistent with the longstanding constitutional right to counsel espoused by the Supreme Court in *Gideon v. Wainwright*, 372 U.S. 335 (1963); *see also* Nassau County Law § 722(2).

Because of that dynamic, it is critically important that the clients' constitutionally-protected right to counsel is free from any perceived bias by or conflict with their attorneys (i.e., Plaintiffs). (Compl. ¶¶ 38–41.) For that very reason, the NCLAS and similar organizations have policies prohibiting any organizational statements that could be deemed "political" in nature. (NCLAS Handbook at 28, Ex. 3 to Kahn Decl.) Indeed, Plaintiffs' employer's handbook prohibits Nassau County legal aid lawyers from having "public involvement in all political matters, causes and issues . . . either in court or in proximity to the clients we are representing," including "displaying all kinds of political buttons, emblems, bumper stickers and the like . . ." (*Id.*) If a client does not trust his counsel because he believes she is biased against him, the attorney-client relationship is irreparably harmed. *Cf. Ellis v. Harrison*, 947 F.3d 555, 562 (9th Cir. 2020) (en banc) (Nguyen, C.J., concurring) ("A trial is fundamentally unfair if defense counsel harbors extreme and deep rooted ill will toward the defendant on account of his race."). *Cf. Commonwealth v. Dew*, 210 N.E.3d 904, 906 (Mass. 2023) ("We conclude that the conflict of interest inherent in counsel's bigotry against persons of the defendant's faith and race, which manifested during

counsel's representation of the defendant, deprived the defendant of his right to effective assistance of counsel - a right upon which our entire system of criminal justice depends to ensure a "fair trial."") (citing *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)).

Take for example, an Israeli-American or Jewish person in need of legal services who is assigned one of Plaintiffs to represent him as court-appointed counsel based on his constitutionally-guaranteed right articulated in *Gideon*. If that court-appointed attorney were among the members on whose behalf the Resolution—which is clearly anti-Israel and has been characterized even by the Legal Aid Society as "laden with coded antisemitic language"—were issued, there can be no reasonable dispute that the attorney-client relationship would be irreparably harmed, and this client might be left with no reasonable recourse.

Simply put, if passed, the Resolution is likely to infect the attorney-client relationship between the Jewish citizens of Nassau County and their NCLAS legal aid attorneys—including Plaintiffs—with the perception that such attorneys are biased against their religion and ethnicity. This irretrievable breakdown—which NCLAS's own guidelines are designed to prevent— substantially interferes with Plaintiffs' ability to perform their jobs as dictated by *Gideon*. This injury is paradigmatically irreparable, as it cannot be rectified by an award of money damages. *See Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 97 (2d Cir. 2005) ("[A]n injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of money damages [is irreparable.]").

Defendants elide this real and impending harm by myopically focusing on particular aspects of the New York Rules of Professional Conduct (NYRPC) to argue that any statement made on behalf of an organization cannot meet the standards under the NYRPC to establish a true conflict of interest. (Br. at 13-16.) According to Defendants, "because a reasonable lawyer would

never presume that each member of a democratic organization supports every statement the organization makes," there is no conflict of interest that will impact the representation. (*Id.* at 14–15.) Defendants cite no authority for this proposition and, in any event, it does not address what *a reasonable client would presume*. (*See* Compl. ¶¶ 38–41.) Nor does it explain that the Resolution is to be issued on behalf the members of the ALAA, rather than the ALAA itself as an organization.

Plaintiffs thus face the irreparable harm of being unable to carry out their duties to serve indigent clients under *Gideon*. Nothing in Defendants' motion addresses that harm.

### B. The Resolution Will Irretrievably Damage Plaintiffs' Professional And Personal Reputations

In addition to making it difficult, if not impossible, for Plaintiffs to provide constitutionally-compliant representation to the Jewish residents of Nassau County, the Resolution also would inflict professional, reputational, and personal harm upon Plaintiffs.

As attorneys in Nassau County, Plaintiffs have relationships with jurists and fellow members of the bar who—not surprisingly given the content of the Resolution and the statements of the legal aid societies about its meaning and import—view statements like those contained in the Resolution to be antisemitic, particularly in the context of the apparent wave of antisemitism in the wake of the October 7 Hamas terrorist attack.[4] In the eyes of these colleagues and fellow members of the community, Plaintiffs' reputations would forever be diminished. *See, e.g., Stein v. Lee Eye Ctr., Inc.*, 2021 WL 5770212, at *3 (W.D. Pa. Dec. 6, 2021) (finding to be irreparable

---

[4] Anti-Defamation League, *ADL Center on Extremism notes nearly 400-percent increase in preliminary antisemitic incidents reported year-over-year* (Oct. 25, 2023), available at https://www.adl.org/resources/press-release/adl-records-dramatic-increase-us-antisemitic-incidents-following-oct-7 (last visited Dec. 12, 2023).

the injuries of "loss to [] reputation" and "standing in the community"); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 50–51 (D.D.C. 2008) (finding irreparable harm based on reputation).

Defendants argue that these harms are insufficiently immediate because they depend upon the reactions that third parties will have to the Resolution.   (*See* Br. At 17.)  But since the ALAA proffered the Resolution, Plaintiffs and their Jewish colleagues have already been castigated and humiliated by members of their own Union.   In the context of discussions surrounding the Resolution, one Union member called Plaintiffs "Zionists"—clearly intended as a pejorative and slur against them—with whom "I will never have camaraderie."   On an ALAA message board, another Union member wrote "From the River to the Sea!", which is widely recognized to be a call for the genocide of Jewish people and elimination of Israel.  (Smith Reply Affirmation ¶¶ 13–14, Ex. 1 to Kahn Decl.)  To Plaintiffs, the emotional and reputational toll of these discriminatory and harassing acts is real and tangible, not speculative or uncertain.  *See Feinerman*, 558 F. Supp. 2d at 50–51.

Moreover, the Resolution itself constitutes a form of compelled speech in which offensive and inflammatory statements would be attributed to Plaintiffs against their wish.  Such compelled speech "creates a presumption of irreparable harm."  *Evergreen Ass'n, Inc. v. City of New York*, 740 F.3d 233, 246 (2d Cir. 2014).  There is no doubt that permitting the Resolution to proceed would cause that central harm to occur, and that this harm cannot be put back in the bottle or remedied with money damages.

## II.     Plaintiffs' Claims Are Likely To Succeed On The Merits

### A.     Defendants Breached The ALAA Constitution And Bylaws

A membership-wide vote on the Resolution is not only not required under the Bylaws in order for the Union to express its views; in fact, the vote and the putative issuance of the Resolution on behalf of the membership is not permitted.  Article IV, Section 1 of the Bylaws clearly lays out

the areas for which the membership "has authority" and must be enforced according to its terms. *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital*, 38 N.Y.3d 169, 178 (N.Y. 2022) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").

Specifically, the membership "has authority to determine critical issues such as ratify contracts, strike, return to work, set dues, and elect Officers and Delegates, including Delegates to UAW Constitutional Conventions."  (ALAA Bylaws ("Bylaws") Art. IV § 1, ECF No. 6-2.) Conversely, because the Resolution has nothing to do with these issues, it is not an area in which the membership "ha[s] authority."  (*See id.*)  Therefore, the vote itself constitutes a breach of the Bylaws.

Defendants mistakenly suggest that, because the same section of the Bylaws states generally that the membership is the "highest authority" within the Union and because the specific list of "critical issues" is not exhaustive, Defendants should decide without any guideposts what sort of issues can be submitted to a membership vote and adopted on behalf of the membership (notwithstanding dissent).  That interpretation ignores the nature of the examples of critical issues expressly provided in Article IV and the use of the term "such as."

Under basic canons of construction, "the meaning of a word in a series of words is determined by the company it keeps" and "a series of specific words describing things or concepts of a particular sort are used to explain the meaning of a general one in the same series."  *242-44 East 77th Street, LLC v Greater N. Y. Mut. Ins. Co.*, 31 A.D.3d 100, 103–04 (1st Dep't 2006). Here, the Resolution is plainly in a completely different category from the types of critical issues that the Bylaws clearly contemplate:  ratifying contracts, strikes, dues, and elections of officers and delegates.

Defendants' own analogy makes this clear.  Defendants liken the Resolution to endorsing a political candidate, which they say unions often do.  Yet, although the Bylaws elsewhere state that advancing political interests is among the Union's purposes (Bylaws Art. III), Article IV does not list anything relating to politics among the "critical issues" for which the membership "has authority."  However, Article IV does provide that the membership has authority to elect officers and delegates, who are then free to make political endorsements and undertake other activities consistent with the Bylaws.

The Resolution is also contrary to the Union's foundational "Principles and Purposes," as provided in the Bylaws.  (Bylaws Art. 3.)  They include, among other covenants, commitments to:

- "organize and unite into the union all workers who represent indigent clients";

- "improve the[ir] working conditions, treatment, wages, benefits, and professional standing";

- "ensure the provision of high-quality legal services to our clients"; and

- "protect all members from illegal, improper, arbitrary or discriminatory treatment."  (*Id.*)

Defendants attempt to minimize these provisions as "aspirational language" that expresses the Union's "goals."  (Br. at 13.)  But these Bylaws "express the terms of a binding contract between the union and its members, which define the privileges secured and the duties assumed by its members."  *Brown v. Sombrotto*, 523 F. Supp. 127, 133 (S.D.N.Y. 1981); *see also Wooddell v. Int'l Bhd. of Elec. Workers, Local 71*, 502 U.S. 93, 100–02 (1991) (recognizing a union's bylaws and constitution as binding contracts under Section 301 of the LMRA.  Hence, when the ALAA and its Defendant officers fail to uphold the Bylaws' promises or act in violation of the Bylaws' guarantees to all members, they commit actionable breach.  *See Mayes v. Local 106, Intern. Union of Operating Eng'rs*, 739 F. Supp. 744, 748 (N.D.N.Y. 1990) (upholding breach-of-contract claim based on violation of union constitution and bylaws that "require[d], among other things, that each

member . . . not engage in conduct which discredits or injures the union or other members"); *Grant v. Commc'ns Workers of Am.,, Local 1101*, 2017 WL 6000605, at *9 (S.D.N.Y. Dec. 1, 2017) (denying summary judgment as to claim for breach of due-process provisions of union's constitution in instituting disciplinary action).

Here, Defendants already breached the Bylaws when they pushed to pass and adopt the Resolution, which was never designed to "unite into the union *all* workers" or to "improve working conditions."  To the contrary, it has predictably driven a wedge between workers who fall on different sides of this charged issue and has resulted in the castigation of Union members of Jewish heritage and faith, as well as others.  For example, the Resolution has already led to an increase in the incidences of harassment and bullying of Jewish workers and others who do not hold the same views as those espoused in the Resolution.  For instance, Plaintiffs were targeted by another Union member writing "From the River to the Sea!".  Those who have opposed the Resolution have been labeled "Zionists" and have been disavowed by other Union members who support the Resolution. (*See* Smith Reply Affirmation ¶¶ 13–14.)

Moreover, Defendants' counsel's proposal that Plaintiffs resign if the Resolution is approved further demonstrates that the adoption of the Resolution violates the Bylaws.  For instance, the Bylaws expressly direct the Union to "unite into the union all workers who represent indigent clients" (Bylaws Art. III) and plainly require that membership must be "open to all employees" (Bylaws Art. IV § 2).

Further, these breaches are not without consequence.  Plaintiffs have been targeted and harassed by other ALAA members.  And, as explained above (*see* § 1.A, *supra*), the Resolution will make it far more difficult to "ensure the provision of high-quality legal services to our clients."

Defendants erroneously (and ironically) argue that an old New York doctrine—the *Martin* rule—forecloses Plaintiffs from suing ALAA for breach of contract. (Br. at 11 (citing, *e.g.*, *Martin v. Curran*, 303 N.Y. 276, 279–80 (1951)); *see also* N.Y. Gen. Ass'ns Law § 13).) "The *Martin* rule 'bars all actions against an unincorporated voluntary membership association and bars claims against the officers of such an association in their representative capacities where there is no allegation that the members of the association authorized or ratified the wrongful conduct complained of." *Performing Arts Ctr. Of Suffolk Cnty. v. Actor's Equity Ass'n*, 2022 WL 16755284, at *5 (E.D.N.Y. Aug. 25, 2022) (Report & Recommendation). Defendants contend that Plaintiffs cannot show unanimous authorization or ratification by ALAA members because "at least 13 people voted against placing the Resolution before the membership." (Br. at 11.) In other words, according to Defendants, because Plaintiffs oppose the Resolution, they cannot assert breach of contract claims related to the Resolution.

But the *Martin* rule does not apply to breach claims as here related to a vote. Indeed, a longstanding carve-out to the *Martin* rule articulated in *Madden v. Atkins* reveals that when a union vote is the basis for an alleged breach of the union's bylaws or constitution, the breach of contract claim can be maintained and there is no requirement that the vote be unanimous. 4 N.Y.2d 283, 294–6 (1958) (holding that plaintiff's wrongful expulsion claim could proceed despite the *Martin* rule where his expulsion had been effected by a non-unanimous vote). The *Martin* rule does not apply.

In any event, "neither the *Martin* rule nor any other authority precludes causes of action from being asserted against individual members of the union defendants in their individual capacities." *Cablevision Sys. Corp. v. Commc'ns Workers of Am. Dist. 1*, 131 A.D.3d 1082, 1083 (2d Dep't 2015). Thus, even if the *Martin* rule were to apply here at all—which it does not—it

certainly does not apply to Plaintiffs' claims against the individual Defendants in their individual capacities for their breaches of their obligations under the Bylaws.

Hence, Plaintiffs are likely to succeed on, or at least raise serious questions going to the merits of, their breach of contract claims.

### B. Defendants Breached Their Duty of Fair Representation

A union's duty of fair representation requires that it must "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Breininger v. Sheet Metal Workers Int'l. Ass'n Local Union No. 6,* 493 U.S. 67, 73 (1989).

The Complaint alleges that Defendants breached their duty of fair representation because their conduct in connection with the Resolution has been "arbitrary, discriminatory, and/or in bad faith." (Compl. ¶ 19.) The Complaint further alleges that the Resolution has been viewed as "overtly antisemitic." (*Id.* ¶ 43.)

Indeed, the Resolution itself provides ample basis to conclude that the Union's effort in forcing an improper vote constitutes either invidious discrimination at worst, or at best was based on improper or irrational motives amounting to arbitrariness and bad faith.

There is no legitimate explanation for forcing a vote on the Resolution given that, for example:

- The Resolution minimizes "the violent tragedy on October 7, 2023" (Resolution at 1) and fails to mention (much less condemn) the terrorist group Hamas that perpetrated the mass murder, brutal rape, torture and kidnapping of civilians, as well as other atrocities.

- The Resolution does not offer any condemnation of the widespread war crimes committed by Hamas on an ongoing basis, including Hamas's continued holding and torture of hostages and Hamas's use of the Palestinian population as human shields.

- The Resolution provides opinions on bitterly contested issues under international law, lending the legitimacy of the Union's attorney membership to an area in which they have no expertise. For example, the Resolution asserts that Israel's actions are "illegal"

(Resolution at 1, 3), amount to "apartheid" (*id.* at 3), and are "in violation of the Geneva Conventions of 1949" (*id.*).

- The Resolution asserts that the State of Israel is engaged in an "occupation and blockade of Palestinian land, sea, and air" (*id.* at 3) and that "ethnic cleansing and dispossession of the Palestinian people" have been "ongoing since the Nakba in 1948 and the Balfour Declaration in 1917" (*id.* at 2). These statements, among others, effectively demand that Union members endorse the erasure of the entire State of Israel.

- Defendants have not been able to identify even a single instance in which the Union procured a membership vote and adopted a resolution on behalf of the membership on any issue other than to criticize Israel. (*See* Digest.)

Unsurprisingly, the Legal Aid Society itself has described the Resolution as "laden with coded antisemitic language and thinly veiled calls for the destruction of the State of Israel" (NCLAS Statement Opposing the Resolution). Such discriminatory statements—whether undertaken due to animus, arbitrariness, or bad faith—do not accomplish any legitimate purpose of the Union. *See, e.g., Breininger v. Sheet Metal Workers Intern. Ass'n Local Union No. 6*, 493 U.S. 67, 78 (1989) ("[A] cursory review of [National Labor Relations] Board volumes . . . discloses numerous cases in which the Board has found the duty of fair representation breached where the union's conduct was motivated by . . . strifes resulting from intraunion politics, and racial or gender considerations.").

Rather than attempting to rebut the Complaint's allegations and the assessment of the Legal Aid Society, Defendants argue that the Court "need not address or attempt to resolve" whether the Resolution is antisemitic. (Br. at 14.) But Defendants cannot have their cake and eat it too. If it is too early for the Court to address whether the Resolution is antisemitic, the record is also insufficient to conclude that Defendants acted without discrimination, arbitrariness, or bad faith. Defendants' ongoing failure to provide any permissible basis for or to defend the Resolution's statements regarding Israel is reason enough at this stage to maintain the injunction.

In a last-ditch effort, Defendants argue that, even if they are found to have violated their duty of fair representation, they should be let off the hook unless the connection between the breach and the alleged harm is sufficiently direct. But Plaintiffs have alleged a number of non-speculative injuries that are likely to result from the vote, as described above. In fact, even the text of the Resolution itself makes clear that harm is likely to directly follow the Resolution, stating that one of its chapters was "threatened with organizational defunding" after adopting similar resolutions, and that many individuals have been threatened for expressing similar views. (Resolution at 3.)

In any event, Defendants' attempts to minimize and excuse antisemitism should be rejected.

## III. The Balance of Hardships And Public Interest Heavily Favor Injunctive Relief

Plaintiffs' showing of a likelihood of success on the merits and irreparable harm is sufficient to meet its burden and warrant injunctive relief without consideration of other factors. *See, e.g.*, *Krispy Kreme Doughnut Corp. v. Satellite Donuts*, 725 F. Supp. 2d 389, 398 (S.D.N.Y. 2010) (granting preliminary injunction upon showing of irreparable harm and likelihood of success on the merits). Moreover, Plaintiffs' claims raise "sufficiently serious questions going to the merits to make them a fair ground for litigation," and injunctive relief is warranted because "the balance of hardships tips decidedly" in Plaintiffs' favor. *See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).[5]

As described above (*see* § 1.A, *supra*), permitting Defendants to force through the Resolution would not only tarnish Plaintiffs' reputations by associating them with statements

---

[5] "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Krispy Kreme Doughnut*, 725 F. Supp. 2d at 398; *see also Spanski Enters., Inc. v. Telewizja Polska S.A.*, 832 F. App'x 723, 724 (2d Cir. 2020) (same).

plainly viewed as antisemitic, but also undermine their ability to provide legal services to indigent clients. Conversely, Defendants will incur no material harm if the Court maintains the status quo and prevents Defendants from holding a vote on the Resolution. As the ALAA's own Constitution and Bylaws forbid Defendants from holding that vote (*see* § II.A, *supra*), maintaining the injunction would simply uphold the status quo by prohibiting Defendants from doing what they are already precluded from doing under the Bylaws and Defendants' duty of fair representation, *see Goat Fashion Ltd. v. 1661, Inc*., No. 18-cv-11045, 2020 WL 5758917, at *16 (S.D.N.Y. Sept. 28, 2020) (where injunction "prohibits [defendant] from engaging in conduct that breaches the Consent Agreement," potential harm to defendant "is a problem of its own making").

Whenever a request for injunctive relief implicates public interests, "a court should give some consideration to the balance of such interests in deciding whether a plaintiff's threatened irreparable injury and probability of success on the merits warrants injunctive relief." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999). The provision of legal services to underserved indigent populations is a quintessential public interest. *See Mass. L. Reform Inst. v. Legal Servs. Corp.*, 581 F. Supp. 1179, 1188 (D.D.C. 1984) (issuing a preliminary injunction in favor of state legal services centers whose grants had not been renewed), *aff'd*, 737 F.2d 1206 (D.C. Cir. 1984). Here, a preliminary injunction would serve the public interest by preserving Plaintiffs' ability—and indeed the ability of other Nassau County legal aid attorneys who are members of the ALAA—to continue representing indigent clients consistent with *Gideon* and the attorney-client relationship. (*See* § I.A, *supra*.)

## IV. The Injunctive Relief Is Consistent With The First Amendment

Defendants' attempt to invoke the First Amendment as an independent basis to avoid the injunction fails. (Br. at 5–8.) Plaintiffs' claims and requested injunctive relief are consistent with the First Amendment.

## A. There Is No Prior Restraint

While Defendants argue that the injunction of the vote amounts to a "prior restraint on expression" (Br. at 6), this argument merely "piggybacks" on Defendants' arguments regarding likelihood of success on the merits "and thus fails for the same reasons." *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 2023 WL 8385065, at *10 n.8 (2d Cir. Dec. 5, 2023). That is because if the underlying allegations are actionable, then an injunction is "*not* considered [a] prior restraint[]." *Id.*

Aside from the fact that Defendants' argument is duplicative, the injunctive relief sought enjoins the vote on the Resolution but does not preclude the Union or its members from expressing their views. Defendants do not actually claim otherwise. While Defendants assert that the TRO precludes the members from "exercis[ing] their authority 'to determine critical issues'" under Article IV of the Union's bylaws (Br. at 5), Defendants omit the remainder of that quotation: the "critical issues" over which the membership "has authority to determine" are "critical issues such as ratify contracts, strike, return to work, set dues, and elect Officers and Delegates, including Delegates to UAW Constitutional Conventions." (*See* Bylaws § IV(1).) Defendants nowhere explain how the Resolution would constitute a "critical issue" of the sort specified in the Bylaws. As also discussed above, it plainly would not. (*See supra* § II.A.)

Indeed, while Defendants assert that the Union "has passed resolutions and/or issued statements on criminal justice, health care, housing, human rights, and international affairs" (Ohta Decl. ¶ 21, ECF No. 6), Defendants do not identify even a single instance in which a resolution was issued in the name of the membership. In fact, it does not appear that the Union has ever

demanded a "membership vote" or issued a resolution on behalf of the membership on any issue other than Israel.  (*See* Digest.)[6]

### B.      There Is No Free Speech Violation

Free speech is not without limits.  "It has long been established that the First Amendment provides no defense to persons who have used otherwise protected speech or expressive conduct to force or aid others to act in violation of a valid conduct-regulating statute." *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 296 (2d Cir. 1992).  Thus, Defendants cannot hide behind the First Amendment to undertake discriminatory actions that violate their duty of fair representation and contractual obligations.

Defendants' assertion that the content of the resolution is protected speech is false and, at a minimum, premature to conclude prior to adjudication on the merits.  For instance, Defendants do not claim that the contents of the proposed resolution are true and accurate.  *See, e.g.*, *Loekle v. Hansen*, 551 F. Supp. 74, 81 (S.D.N.Y. 1982) ("there is no constitutional value in false statements of fact" (quoting *Gertz v. Welch*, 418 U.S. 323, 340 (1974)).

Moreover, courts have scrutinized free speech claims by attorneys—holding, for instance, that the First Amendment does not permit lawyers to violate ethics rules.  That is because, "[u]nlike lay persons, an attorney is 'an intimate and trusted and essential part of the machinery of justice'" and "perceived by the public to be in a position of knowledge, and therefore, 'a crucial source of information and opinion.'"  *Matter of Giuliani*, 197 A.D.3d 1, 7 (1st Dep't 2021) (citing *Gentile v. State Bar of Nevada*, 501 U.S.1030 (1991)).  Here, Defendants' actions should be subject to particular scrutiny because the Resolution contains a number of inflammatory assertions and

---

[6]      The other "Statements and Positions" appear to be references, *e.g.*, to statements by Union officers, newsletters, lectures, and resolutions by the Union's Delegate Council and Executive Board.  (*See* Digest.)

baseless legal conclusions with respect to Israel's actions under international law. The First Amendment also provides no shelter for creating violations of ethical duties for the Union's membership. (Compl. ¶¶ 11, 31, 40.)

## C. The Resolution Would Improperly Compel Speech

Contrary to Defendants' suggestions, there is no First Amendment right to compel speech or to falsely assert that Plaintiffs as Union members support an antisemitic statement.

Defendants characterize plaintiffs' objection as that they "simply do not want to be associated with the Resolution." (Br. at 18.) But that misstates the nature of the Resolution and the vote. By imposing a vote on the Union membership and issuing the Resolution on behalf of the membership, the entire purpose of the Resolution is to take a statement that Union leadership could have made on its own—as it does with respect to issues other than Israel—and to claim that Union members support the statement.

Indeed, if a statement were made by Union leadership, rank-and-file members could exercise their free speech rights by choosing to associate themselves with that statement, however abhorrent it may be. They could do so in any number of ways, such as signing a petition or sharing the statement on social media. What the Union should not be permitted to do is to amplify and legitimize a politically inflammatory, biased, and antisemitic communication by presenting it, falsely, as a message from all legal aid attorneys in the chapter membership. It is especially egregious because the individual legal aid attorneys the Resolution purports are its authors are in fact prohibited from publicly connecting their positions as legal aid lawyers to such a message. (*See* NCLAS Handbook at 8.) The notion that ALAA may capitalize upon the integrity, objectivity, and legitimacy associated with being a legal aid attorney in service of its own biased political agenda—an active degradation of legal aid lawyers' professionalism and objectivity—in

the public eye turns free speech on its head and cannot be required by the First Amendment. It is an injury.

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' Motion to Dissolve the Temporary Restraining Order and impose a preliminary injunction prohibiting the vote and adopting of the Resolution pending a decision Plaintiffs' claims on the merits.

Dated: New York, New York
      December 13, 2023

SHEARMAN & STERLING LLP

*/s/ Jeffrey D. Hoschander*
_____
By:    Sara N. Raisner (admission pending)
       Jeffrey D. Hoschander
       Daniel Kahn
       599 Lexington Avenue
       New York, NY 10022-6069
       212.848.4000