# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
------------------------------------------X
DIANE T. CLARKE,
ILANA KOPMAR, ISAAC ALTMAN and                    **Reply Affirmation in Support of**
DAVID ROSENFELD,                                  **Continued Restraining Order and**
                                                  **Request for Injunctive Relief**

                        Plaintiffs,

            - against -                      Index No.: 618764-2023

THE ASSOCIATION OF LEGAL AID
ATTORNEYS, AMALGAMATED LOCAL                      JUSTICE ASSIGNED:
UNION 2325 OF THE INTERNATIONAL                   HON. FELICE J. MURACA
UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW), AFL-CIO,
LISA OHTA, BRET J. TAYLOR, JEREMY
BUNYANER, EMILY C. EATON, MARTYNA
KAZNOWSKI, GILLIAN R. KRESS,
JOANA CALIN, PUJA PAUL,
                        Defendants.
------------------------------------------X

        DAVID A. SMITH, ESQ., an attorney duly licensed to practice before the Courts of the State of New York, affirms under penalty of perjury and pursuant to CPLR 2106 that:

        1.    I am a member of the Law Office of David A. Smith, PLLC, attorneys for the Plaintiffs in the above-captioned action. I respectfully submit this Reply Affirmation in Support of Continuing Restraining Order and Request for Injunctive Relief in Reply to Defendant's Memorandum of Law in Opposition to Plaintiffs' Application for Injunctive Relief of ALLYSON L. BELOVIN, ESQ., and Defendant LISA OHTA's "Declaration in Opposition to Order to Show Cause", both of which are dated November 20, 2023, and in further support of Plaintiffs' preliminary injunction motion barring and enjoining the Defendant labor union and its officers (hereinafter "the Defendants") from going forward with a vote to adopt a document bearing the

title "Resolution Calling for a Cease Fire in Gaza, an End to the Israeli Occupation of Palestine" (hereinafter "the Gaza/Palestine Resolution").

2. Over this past weekend, virtually immediately after this Court issued a temporary restraining order on November 17, 2023 restraining and enjoining Defendants from distributing, disseminating the Gaza/Palestine Resolution or putting it to a vote, Defendants instead "doubled down" by releasing the attached press release, explicitly stated to have been "FROM RANK AND FILE MEMBERS OF ALAA UAW 2325" (which would include Plaintiffs and associate them individually therewith, as is alleged in the Complaint), and with contact information listed as "alaaforpalestine@gmail.com" bearing the title, in bold print, **"Judge Unconstitutionally Muzzles ACAA UAW Local Membership Vote on Resolution Calling For Cease Fire in Gaza and a Free Palestine"** (emphasis in the original). *See,* **Exhibit A** hereto.

3. The United States Supreme Court has long held that labor unions, having taken on the role of protecting the livelihoods of their members, have contractual and fiduciary limits to their authority. Unions are under a duty to represent all workers in a bargaining unit "without hostile discrimination, fairly, impartially, and in good faith." Steele v. Louisville & Nashville Ry. Co., 323 U.S. 192, 204 (1944) (racist union that only allowed white employees to vote but purported to bind and represent the interests of Black employees subject to injunction and damages claim from Black employees).

4. In Phalen v. Theatrical Protective Union No. 1, Int'l All. of Theatrical & Stage Emp., AFL-CIO, 22 N.Y.2d 34, 43-44 (1968), the New York Court of Appeals reinstated a state-court lawsuit filed by workers who sued a union claiming the union acted discriminatorily in its admissions, and held that a state court action for injunctive relief and damages against the union is allowed. Speaking for the Concurrence, Judge Fuld placed into context the legally imposed

limits on unions when it comes to discriminating against some workers, and the right of the aggrieved workers to sue in state court for an injunction and damages:

> The importance of the union in the economic life of the employee today cannot be overemphasized and, accordingly, its authority to act as exclusive representative is subject to the concomitant obligation to represent all members of the bargaining unit 'without hostility of discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.' (*Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842; *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363§, 11 L.Ed.2d 370.) A union which breaches its statutory mandate to represent all employees fairly and without discrimination is subject to an action for damages and an injunction to prohibit the continuance of the discriminatory conduct. (See, *Steele v. L. & N.R. Co.*, 323 U.S. 192, 207, 65 S.Ct. 226, 89 L.Ed. 173; *Tunstall v. Brotherhood*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187; *Syres v. Oil Workers Int. Union*, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785.)
>
> The Supreme Court, in the *Steele* case (323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173, *supra*), declared that the Railway Labor Act imposed on the union a duty, 'in collective bargaining and in making contracts with the carrier, to represent non-union or minority union members of the craft without hostile discrimination, fairly, impartially, and in good faith' (323 U.S., at p. 204, 65 S.Ct. at p. 233). And, in ensuing years, the courts have applied the doctrine to cases involving racial (see, e.g., *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80; *Brotherhood of Railroad Trainmen v. Howard*, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283), as well as nonracial (see, e.g., *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842, *supra*; *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370, *supra*; *Ford Motor Co. v. Huffman*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048), discrimination.

5.  At its most rudimentary level, the union's duty of "fair representation" is a duty "to make an honest effort to serve the interests of all, ... without hostility to any." Ford Motor Co. v. Huffman, 345 U.S. 330, 337 (1953). Under Supreme Court precedent, the Plaintiff employees establish union discrimination entitling them to injunction and damages upon showing:

> "<u>substantial evidence of discrimination that is intentional, severe, **and unrelated to legitimate union objectives**</u>."

<u>Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Employees of Am. v. Lockridge</u>, 403 U.S. 274, 301 (1971) (internal quotations omitted) (emphasis added); <u>see also Vaca v. Sipes</u>, 386 U.S.

171, 177 (1967); Beck v. United Food & Com. Workers Union, Loc. 99, 506 F.3d 874, 880 (9th Cir. 2007).

6. These rights to prevent a union from engaging in discrimination are not obviated by the union's cries of "free speech". The union's obligations to Plaintiffs are a function of its contractual and fiduciary duties, and do not involve "state action" or the suppression of speech by the government or other state action, which is all that is protected by the First Amendment to the U.S. Constitution. See U.S. Const. Amend. I ("Congress shall make no law ... abridging the freedom of speech"); Kidwell v. Transportation Commc'ns Int'l Union, 946 F.2d 283, 297 (4th Cir. 1991) ("To raise the First Amendment argument, the union's actions must constitute state action. We are inclined to believe, however, that no state action exists outside of the narrow area of those actions taken by the union as the collective bargaining representative"). Moreover, if anything, it is *Plaintiffs'* constitutional rights not to have virulent and antisemitic hate speech associated with them that is paramount. See id.

7. Plaintiffs amply establish this "substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives" standard. As shown at length in the pleadings and Affirmations already filed by this office in this proceeding on behalf of the Plaintiffs herein, the Gaza/Palestine Resolution is blatantly and directly discriminatory to all Jews and to all union members who abhor Antisemitism and do not want to suffer the very real and inescapable direct and immediate consequences they will face if the Gaza/Palestine Resolution is adopted, including breach of employment obligations under the Legal Aid Society of Nassau County's employee handbook rules, breach of ethical obligations as attorneys to their clients, future employment prospects, potential loss of livelihood, and other severe impacts.

8. In connection therewith, Exhibits annexed to the undersigned's Supplemental Affirmation dated November 17, 2023, demonstrate beyond question that the Plaintiffs herein have been singled out, targeted and discriminated against based upon matters related to the Gaza/Palestine Resolution. The three (3) Plaintiffs who are Jewish, and the one (1) Plaintiff who is not Jewish, were each referred to by one Union member in dialogue regarding the Gaza/Palestine Resolution as "Zionists" whom the writer stated "I will never have camaraderie with", with the word "Zionist" clearly and unambiguously used as a pejorative and slur against them.

9. The three (3) Jewish Plaintiffs were also subjected to another union member writing "From the River to the Sea!", which is widely recognized by many scholars who have studied the history of antisemitism and hate movements in general to be a call for the genocide of Jewish people and the complete and utter destruction of the nation of Israel. In this manner, both ALAA leadership and likeminded constituent members in favor of the Resolution themselves have quite clearly attributed a discriminatory intent to the Resolution, with the forum designed to discuss same (described by ALAA leadership as a "safe space") having been used for the purposes of employing a type of stochastic terrorism against Plaintiffs.

10. As hereinbefore stated, the rights on the part of Plaintiffs to prevent the ALAA from engaging in discrimination are not obviated by the union's cries of 'free speech'. The Gaza/Palestine Resolution materially and substantially interferes with the obligations of the Legal Aid Society, the County of Nassau and the State of New York under the landmark Supreme Court ruling in the matter of <u>Gideon v. Wainright</u>, 372 U.S. 335 (1963), and materially and substantially interferes with the ability of Plaintiffs to carry out their duties and obligations as attorneys admitted to practice law in the State of New York to past, present and prospective future clients, and to otherwise satisfy their contractual obligations to their employer. This conflict of interest hinders

the Plaintiffs' ability to represent *all* qualifying indigent clients and their interests, regardless of their race, creed, nationality, etc., including past, present and prospective future Jewish clients.

11.  Quite ironically, in the very same Memorandum of Law in which she decries that the Plaintiffs are somehow seeking to improperly undermine Defendants' "free speech", Ms. BELOVIN, at page 14 thereof, asserts that the Plaintiffs "are not helpless" and that they "need not sit around waiting for others to assume things about them."

12.  Ms. BELOVIN's claimed remedy on the part of the Plaintiffs is for the Plaintiffs to "exercise their own free speech rights and publicly oppose the Resolution...." It is hard to articulate just how applicable this very principle is to the Defendants themselves, *none of whom have had their individual and personal rights to free speech infringed upon and/or implicated in any manner, whatsoever, by virtue of the interim relief heretofore granted and requested herein*. The difference is that Defendants, rather than simply forever tarnishing *their own individual reputations* by engaging in an antisemitic screed such as the proposed Gaza/Palestine Resolution, are actively seeking to speak in Plaintiffs' name and similarly forever tarnish Plaintiffs' reputations and associate them with hate speech, on matters fundamentally unrelated to the constitutional mandate of the Legal Aid Society, regarding events transpiring on the other side of the planet. Simply stated, the Gaza/Palestine Resolution couldn't *possibly* be less relevant to the job of a Public Defender in the United States of America.

13.  The Gaza/Palestine Resolution further both directly and indirectly interferes with the constitutional obligations of the Plaintiffs to their indigent clients, their ability to carry out their roles as Public Defenders employed by NCLAS and to more generally do their job, now and into the future, as clearly set forth in the underlying Complaint herein at paragraph 7 thereof; to wit:

> "The State of New York, as well as all other forty-nine (49) States within the United States of America ('USA'), are required to provide counsel to

-6-

indigent criminal Defendants and certain other qualifying individuals pursuant to the United States Constitution and the landmark 1963 Decision issued by the Supreme Court of the United States of America [] in the matter of *Gideon v. Wainwright,* 372 U.S. 335 (1963). The right to counsel is an individual and absolute right on the part of indigent defendants and other qualifying individuals to have legal counsel appointed for them, and the not-for-profit organization referred to herein, NCLAS, was created for the specific purpose of fulfilling New York State's obligations to its qualifying citizens – as is required by the aforementioned SCOTUS Decision issued in the matter of *Gideon v. Wainwright* – to provide said qualifying individuals with quality legal representation, thereby guaranteeing them, *inter alia*, a fair trial."

(*See*, Complaint at page 3, paragraph 7).

14. The Legal Aid Society of Nassau County Employee Handbook, which is incorporated into the Collective Bargaining Agreement, specifically prohibits political activities that will be ascribed to the Society or to its attorneys, particularly any activity that will imperil the Society's ability to represent all persons. A true copy of the said Employee Handbook is annexed hereto as **Exhibit B**. To quote just some of its very clear prohibitions which are directly at odds with the Gaza/Palestine Resolution:

Page 28

INVOLVEMENT IN POLITICAL CAUSES, JUDICIAL AND DISTRICT ATTORNEY

POLITICS:

**All employees are to avoid public involvement in all political matters**, causes and issues, including those which involve Nassau County judicial electoral politics and District Attorney electoral politics, either in court or in proximity to the clients we are representing. This includes the avoidance of displaying all kinds of political buttons, emblems, bumper stickers and the like while in the office or in court, attendance at political fundraisers, or participation in political committees to (re)elect judicial candidates, district attorney candidates and local Nassau County officials. **This policy reflects the Society's concern that the display of political slogans, symbols or messages may be inconsistent with our obligations to protect our client's best interests.**

Staff members who wish to exercise the rights afforded them under the National Labor Relations Act ("NLRA") may post any political or other cause-oriented

notices or placards within their offices and/or cubicles provided such do not contravene applicable law and does not result in untidy or excessive sign age which obstructs normal workflow or causes unnecessary concern for our clients and visitors to the office. Staff members may display such messages, emblems and buttons within their private work space, and may post on the conference room's bulletin board (the former kitchen) any written notice of interest or import to staff members. In no event shall staff members display emblems or buttons promoting any political or other cause-oriented matters in court.

Page 29

PRESS INTERVIEWS AND PUBLICITY:

No member of the staff may give any interview to the press or other media, or accept or solicit speaking engagements or writing assignments on behalf of the Society, without prior approval from the Attorney in Chief.

If an employee accepts a speaking or writing engagement as an individual and not as a representative of the Society, that employee must make sure the Legal Aid Society is completely and effectively disassociated from the presentation or writing.

**In the event an employee wishes to list his/her name in support or against any particular cause or occasion, that employee shall not include the Legal Aid Society as part of the listing, even for purposes of identification, unless prior approval has been obtained by the Attorney in Chief.**

Page 32

SOCIAL MEDIA AND BLOGGING POLICY:

Introduction:

The Legal Aid Society of Nassau County recognizes the popularity of "blogging" as a means of sharing experiences, ideas and opinions with the public. By "blogging", we mean posting or sharing information or commentary through personal web-logs, web sites, social networking, chat rooms, or other public Internet systems, including Facebook and YouTube. However, you should be aware that there may be significant legal and other ramifications to you and the Society that arise from this activity. We have, therefore, adopted the following Policy to ensure compliance with legal and regulatory restrictions and privacy and confidentiality concerns.

Who Is Covered?

**The Policy applies to all employees and covers all Internet communication**

-8-

occurring both during work time and non-work time on either Society-sponsored or personal accounts that may be accessed by the public or third parties.

Terms Applicable to all Blogging:

The Legal Aid Society's equal employment opportunity policy, our policies prohibiting sexual, and other forms of harassment, and our policy against workplace violence are applicable to Internet communications, including blogging. In addition, other Legal Aid Society employment policies apply as well.

Page 33

Employees must adhere to The Legal Aid Society's Confidentiality Policy in the course of all Internet communication, which means that no information can be posted which discloses, directly or indirectly, The Legal Aid Society's client's confidential information, the identity or personal information of any client or potential client or confidential information about fellow employee(s), unless such disclosure is authorized.

Employees may not use social networking sites to contact any clients of The Legal Aid Society whose identity and/or contact information was acquired through a business transaction, unless such client gives his/her written permission for such contact.

**Any content posted on social media that would violate any terms of this employee handbook may result in disciplinary action**.

RESPONSIBILITY FOR ONLINE ACTIVITIES

**The Legal Aid Society considers you personally responsible for any online activity that is linked to or may be traced back to the Society. This includes any use of the company's name, internet domain, email address or property including computers, smart phones, or other hardware. It also includes when you identify yourself as being employed or affiliated with the Society even if you do so while using your own device. When you use the company's name, domain name, email address or contact information, images of company property or personnel, or company's computers and other resources this may imply that you are acting on the company's behalf.**

Page 33

THINK BEFORE CONNECTING:

Remember that there are ethical guidelines that govern communications between lawyers and their staff and represented and non-represented individuals. These

-9-

rules, vary from jurisdiction to jurisdiction, and apply to both traditional and social media enabled communications. Before using social media to either directly communicate with or perform an investigation as to any represented or non-represented adversary, you must familiarize yourself with the scope of what is permitted in the relevant jurisdiction.
(*Id.*; emphasis supplied).

15. In addition to violating the clear mandates of Plaintiffs' employment, on November 16, 2023 the Board of Directors of the Nassau County Legal Aid Society have issued a **"Unanimous Statement Opposing the Resolution of the Association of Legal Aid Attorneys (ALAA), UAW Local 2325"**. See **Exhibit C** hereto. This directive was distributed by urgent email to all Nassau Legal Aid attorneys the day it was issued, and it makes clear that the Resolution is antithetical to the functions of the Society, stating:

> "The Legal Aid Society of Nassau County (NCLAS), by its management and Board of Directors unanimously and emphatically rejects the resolution from the Association of Legal Aid Attorneys (ALAA), UAW Local 2325, the chief bargaining unit of Nassau County Legal Aid Attorneys, which includes antisemitic language and a thinly veiled call for the destruction of the State of Israel. This resolution does not represent the values or mission of our office, and is divisive and hurtful to so many members of our staff and clients. We will never support an antisemitic, anti-religious, anti-ethnic or racist statements made by any organization.
>
> While the Legal Aid Society of Nassau County has a longstanding policy against taking positions on international and national political events, and while we are well aware and concerned about the ongoing humanitarian issues on both sides of this conflict, NCLAS will not stand idly by and allow this irresponsible and antisemitic resolution to stand as it does not reflect the mission of our office. Notably, the ALAA resolution inexplicably fails to mention the atrocities inflicted by Hamas against 1,400 men, women and children from Israel and other countries who were raped, killed, beheaded, burned and kidnapped on October 7, 2023. The resolution cannot be defended and must be rejected in its totality."
>
> (*See,* **Exhibit C**).

16. Further, by the express terms of the New York State Rules of Professional Conduct [22 NYCRR § 1200], Rule 8.4, lawyers cannot "(d) engage in conduct that is prejudicial to the administration of justice" or "(h) engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer." Engaging in racist activities has been found to violate both of those prohibitions. See e.g. In re Hennessey, 155 A.D.3d 1425, 1425, 65 N.Y.S.3d 317, 319 (1st Dept. 2017).

17. Over and above ethical rules applicable to all New York lawyers, lawyer ethical rules applicable specifically to Legal Aid Society attorneys, Public Defenders, and other attorneys who provide assigned legal representation to indigent persons, specifically prohibit them from engaging in political activity that is discriminatory and that will call into doubt their ability to zealously represent all assigned clients.[1] Thus, the New York State Bar Association's *Mandated Representation Standards* (published at https://nysba.org/app/uploads/2020/02/Standards-for-Quality-Mandated-Rep_2021.pdf), provides:

> II. Independence
>
> A. All plans and programs for providing publicly-funded legal services should be designed to guarantee the integrity of the relationships between lawyers and

---

[1] New York State Defenders Association, which provides a detailed, comprehensive list of public defense practice standards on its website at https://www.nysda.org/page/PDStandards, which reads, in relevant part as it relates to this matter, as follows:

**NYSDA Client-Centered Representation**
....
9. Acknowledges personal cultural values, beliefs, and prejudices that might affect his or her ability to effectively represent a client and takes appropriate steps to shield the client from resulting harm.
....
**NY Courts Statement of Client's Rights**
....
3. You are entitled to your lawyer's independent professional judgment and undivided loyalty uncompromised by conflicts of interest.
.....
9. You are entitled to have your attorney conduct himself or herself ethically in accordance with the New York Rules of Professional Conduct.

clients. **All processes for providing counsel should be free from political influence** and conflicts of interest. The lawyers provided should likewise be independent and conflict-free.

B. **All local plans and programs for providing public legal services should be independent and free from political influence,** while accountable for the provision of high-quality, zealous services. This requirement applies to offices or programs of all types permitted by law, whether they are free-standing or governed by local or regional boards. **Actions that must be insulated from political influence and conflicts of interest** include, but are not limited to: 1. funding a plan or program; 2. hiring or selecting and firing or retaining the chief attorney to head the office or program, other lawyers, and associated professionals; 3. matching the abilities of individual lawyers and associated professionals with particular cases; 4. paying salaries or fees; and 5. providing needed auxiliary resources. (emphasis added).
(Emphasis supplied.)

18.     Moreover, the *Defendant Union's own Constitution* prevents it from engaging in conduct that will result in a breach of their member-employees' contractual obligations to their employer. The Union is part of the UAW, whose Constitution (published at https://uaw.org/wp-content/uploads/2019/01/2018-UAW-Constitution.pdf) provides at its Article 19:

Contracts and Negotiations Section 1. **It shall be the established policy of the International Union to recognize the spirit, the intent and the terms of all contractual relations developed and existing between Local Unions and employers, concluded out of conferences between the Local Unions and the employers, as binding upon them. Each Local Union shall be required to carry out the provisions of its contracts. No officer, member, representative or agent of the International Union or of any Local Union or of any subordinate body of the International Union shall have the power or authority to counsel, cause, initiate, participate in or ratify any action which constitutes a breach of any contract entered into by a Local Union or by the International Union or a subordinate body thereof.**
(Emphasis added.)

19.     Labor Law Section 807 does not prohibit this Court from issuing a Temporary Restraining Order or Granting Injunctive Relief as requested by the Plaintiffs herein.

20.     As it relates to the instant matter, Labor Law Section 807 merely provides that a temporary restraining order or preliminary injunction is not available in connection with "labor

-12-

disputes" unless the Court makes specific enumerated findings analogous to a "likelihood of success on the merits" analysis (*See*, quoted language, *infra*).

21.     Labor Law Section 807 does not apply to this type of dispute that does not pertain to the Collective Bargaining Agreement or involve the union's own initiative to enact a Resolution. Simply stated, this is *not* a "labor dispute"; it is a litigation concerning conduct undertaken by the Union that is, for all of the reasons herein before stated, blatantly and outrageously in violation of all of the professional and ethical considerations and citations provided herein.

22.     In response to a specific argument raised by Defendants in their responding papers, Plaintiffs, by mere virtue of being Legal Aid attorneys in this State and in this County, whose mandate it is to serve indigent criminal defendants as their attorneys without bias toward their religion, race, color or creed whom they have the solemn duty to serve, are deprived of their ability to do so as attorneys as a direct and proximate effect of what Defendants are seeking to state in their names and on their behalf as constituent members of the ALAA.

23.     The Defendants herein, in their breathless attempt to jump on a bandwagon of what they apparently perceive as being the issue du jour, have quite simply lost sight of the very reason they have their jobs to begin with, and who it is that they're supposed to serve.

24. For all of the above-stated reasons, and those previously and otherwise stated, a preliminary injunction and the other relief sought in Plaintiffs' Verified Complaint should be granted in all respects.

Dated: November 20, 2023
Garden City, New York

*David A. Smith* (signature)
David A. Smith
Law Office of David A. Smith, PLLC
*Attorneys for Plaintiffs DIANE T. CLARKE, ILANA KOPMAR, ISAAC ALTMAN, and DAVID ROSENFELD*
500 Old Country Road, Suite 109
Garden City, New York 11530
(516) 294-7301
Dave153@aol.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

618764 / 2023

DIANE T. CLARKE, ILANA KOPMAR, ISSAC ALTMAN and DAVID ROSENFELD,

Plaintiffs,

- against -

THE ASSOCIATION OF LEGAL AID ATTORNEYS, AMALGAMATED LOCAL UNION 2325 OF THE INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA (UAW) AFL-CIO, LISA OHTA, BRET J. TAYLOR, JEREMY BUNYANER, EMILY C. EATON, MARTYNA KAZNOWSKI, GILLIAN R. KRESS, JOANA CALIN, PUJA PAUL,

Defendants

Reply Affirmation in Support of Continued Restraining Order

Signature (Rule 130-1.1-a)

Print name beneath: DAVID A. SMITH

Attorney for
LAW OFFICE OF
DAVID A. SMITH, PLLC
500 Old Country Road, Suite 109
GARDEN CITY, NEW YORK 11530
Office and Post Office Address, Telephone
PHONE: (516) 294-7301
FAX: (516) 393-7594

To

Attorney(s) for

Service of a copy of the within is hereby admitted.
Dated,

Attorney(s) for

---

NOTICE OF ENTRY

PLEASE take notice that the within is a (certified) true copy of a duly entered in the office of the clerk of the within named court on

Dated,
Yours, etc.
LAW OFFICE OF
DAVID A. SMITH, PLLC
Attorney for
Office and Post Office Address
500 Old Country Road, Suite 109
GARDEN CITY, NEW YORK 11530

To

Attorney(s) for

NOTICE OF SETTLEMENT

PLEASE take notice that an order of which the within is a true copy will be presented for settlement to the Hon. one of the judges of the within named Court, at

on
at M.
Dated,
Yours, etc.
LAW OFFICE OF
DAVID A. SMITH, PLLC
Attorney for
Office and Post Office Address
500 Old Country Road, Suite 109
GARDEN CITY, NEW YORK 11530

To

Attorney(s) for