```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NASSAU  :  TRIAL TERM PART 13
 2   ------------------------------------------X
     DIANE T. CLARKE, ILANA KOPMAR, ISAAC ALTMAN,
 3   DAVID ROSENFELD,

 4                         Plaintiffs,
                                            Index No.
 5                                          618764/2023
                   -against-
 6
     THE ASSOCIATION OF LEGAL AID ATTORNEYS,
 7   AMALGAMATED LOCAL UNION 2325 OF THE
     INTERNATIONAL UNION, UNITED AUTOMOBILE,
 8   AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS
     OF AMERICA (UAW), AFL-CIO, LISA OHTA, BRET J.
 9   TAYLOR, JEREMY BUNYANER, EMILY C. EATON,
     MARTYNA KAZNOWSKI, GILLIAN R. KRESS,
10   IOANA CALIN, PUJA PAUL,

11                         Defendants.
     ------------------------------------------X
12                    November 21, 2023
                      Mineola, New York
13
     B E F O R E:
14           HON. FELICE J. MURACA, Justice

15   A P P E A R A N C E S:

16           LAW OFFICE OF DAVID A. SMITH, PLLC
             Attorney for Plaintiffs
17           500 Old Country Road
             Garden City, New York 11530
18      BY:  DAVID A. SMITH, ESQ.

19           LEVY RATNER
             Attorneys for Defendants
20           80 8th Avenue
             New York, New York 10011
21      BY:  ALEKSANDR L. FELSTINER, ESQ.
             ALLYSON L. BELOVIN, ESQ.
22

23

24                       JENNIFER A. SCHMIDT, CSR
                         OFFICIAL COURT REPORTER
25
```

1        THE COURT CLERK:  Index number 618764 of

2   2023, Diane T. Clarke, Ilana Kopmar, Isaac Altman,

3   David Rosenfeld, plaintiffs, against the Association of

4   Legal Aid Attorneys, Amalgamated Local Union 2325 of

5   the International Union, United Automobile Aerospace

6   and Agricultural Implement Workers of America (UAW),

7   AFL-CIO, Lisa Ohta, Bret J. Taylor, Jeremy Bunyaner,

8   Emily C. Eaton, Martyna Kaznowski, Gillian R. Kress,

9   defendants.

10        Plaintiff's counsel, please rise, give your

11   appearances for the court.

12        MR. SMITH:  Thank you.  Good morning, your

13   Honor.

14        THE COURT:  Good morning.

15        MR. SMITH:  David A. Smith, Law Office of

16   David A. Smith, PLLC, 500 Old Country Road, Suite 109,

17   Garden City, New York 11530 on behalf of all four of

18   the plaintiffs, Diane T. Clarke, Ilana Kopmar, Isaac

19   Altman, David Rosenfeld, and three of my four clients,

20   with the exception of David, are also present in the

21   courtroom.  To my right, your Honor, my partner, Daniel

22   J. Smith.

23        MR. J. SMITH:  Good morning.

24        MR. SMITH:  And my associate, Joseph M.

25   Purcell.

Proceedings                          3

1              MR. PURCELL:  Good morning.

2              THE COURT CLERK:  Defendant's counsel, please

3      rise and state your appearances for the court.

4              MR. FELSTINER:  Good morning.  Aleksandr

5      Felstiner of Levy Ratner representing all of the named

6      defendants.

7              THE COURT CLERK:  Your address?

8              MR. FELSTINER:  80 8th Avenue, 8th Floor, New

9      York, New York.

10             MS. BELOVIN:  Allyson L. Belovin, also with

11     Levy Ratner, same address.

12             THE COURT:  Good morning, counsel.  Welcome.

13     Welcome all.

14             This court issued a TRO a couple of days ago,

15     and we are here today to hear argument regarding the

16     TRO and whether or not it should be continued.

17     Plaintiff, you go first.

18             MR. SMITH:  Thank you, your Honor.  Is there

19     an allotted time, your Honor?

20             THE COURT:  No allotted time.

21             MR. SMITH:  Thank you.

22             THE COURT:  If you would like to use the

23     lecturn.

24             MR. SMITH:  If I may.

25             THE COURT:  You can move it to any location

js

1     you like.

2            MR. SMITH:  It's where I feel most

3     comfortable.  I am the proprietor of the Law Office of

4     David L. Smith, PLLC, and I and the three attorneys in

5     my office Daniel, Joseph and Ryan Dougherty, who is

6     elsewhere engaged today, are the pro bono attorneys for

7     all four of the plaintiffs in this action.  The four

8     plaintiffs in this action in the order listed in the

9     caption are Diane T. Clarke, Ilana Kopmar, Isaac Altman

10    and David Rosenfeld.  Each of them is employed full

11    time as an attorney by the Nassau County Legal Aid

12    Society.  Each of them is engaged full time in the

13    daily representation of indigent clients in Nassau

14    County primarily in criminal matters but also in

15    specific categories of civil matters that are defined

16    in the charter of the Nassau County Legal Aid Society

17    as being categories in which indigent clients are

18    entitled to free counsel without having to pay any

19    fees.  All four of the plaintiffs is a member in good

20    standing of the defendant union.

21            Your Honor, I never had the pleasure of

22    meeting Ilana or Isaac or David until the middle of

23    last week.  As to Diane, I am her proud and sometimes

24    awed father-in-law as she is the wife of my son-in-law

25    and partner, Dan Smith.  It so happens, Judge, it

js

Proceedings                          5

1    shouldn't matter here, but it does, that Ilana, Isaac

2    and David are all practicing Jews.  It also so happens

3    that Diane is Catholic and African-American.  In the

4    case of each of the four of them, their religious

5    beliefs are an important part of their identity.

6              As for the eight individual defendants in

7    this matter, each of them is identified in the

8    complaint in this action by their respective titles as

9    the eight board members of the defendant union.  As

10   such, each of the eight individual defendants bears

11   personal responsibility for the defendant union having

12   adopted a document attached to our complaint in this

13   action as Exhibit A that bears the title, "Resolution

14   Calling for a Ceasefire in Gaza, an End to the Israeli

15   Occupation of Palestine and Support for Workers'

16   Political Speech," and bearing date of November 2023.

17   The parenthetical question that everyone I have spoken

18   to about this case, regardless of their own views or

19   background, is what the heck is a union that supposedly

20   represents each and every Legal Aid lawyer in New York

21   State, who is a member of that union doing opining on

22   any international political event, much less doing so

23   in a manner that is blatantly anti-Semitic.

24              For purposes of brevity as I go on, I am

25   going to refer to this hateful and extremely misguided

                                                        js

1    anti-Israeli and anti-Semitic screed that they have

2    published, and that in the event that the court were to

3    lift its restraining order, they would again try to

4    pass and ballyhoo as being a resolution adopted on

5    behalf of all Legal Aid lawyers in New York, including

6    my clients, I'm going to refer to it as the

7    Gaza/Palestine resolution, although I will admit in all

8    candor I'm tempted to refer to it by something more

9    direct.

10              I can tell this court without revealing any

11   client confidences, judge, that each of my four clients

12   were appalled, pained, professionally aggrieved and

13   personally aggrieved when they found out earlier this

14   month that the defendant union, which is charged with

15   the duty, by the way, of representing all four of my

16   clients and every Legal Aid lawyer in New York State

17   who is a member of the union in collective bargaining

18   and other employer interactions with the union employer

19   interactions with the Nassau County Legal Aid Society

20   and the other Legal Aid Societies county by county that

21   their own union, their own union, was hell bent on

22   disseminating its hateful Gaza/Palestine resolution to

23   all of its union members, and that on Friday of last

24   week they were putting it to a one-day vote "yay" or

25   "nay" as becoming an official union position that

1       would, if adopted, be broadly disseminated as being an

2       official position adopted by the defendant union on

3       behalf of all union members.  Each of our four

4       professional clients expressed to us one by one their

5       grave and urgent professional and personal concerns

6       about being confronted by their own union, by their own

7       union, with being asked to vote on the Gaza/Palestine

8       resolution.  Each of them, I can state without

9       revealing any client confidences, felt and feels that

10      their own reputation in the legal community at large,

11      their reputation before the judge before whom they

12      practice on a day in and day out basis, their

13      reputation in dealing with the Nassau County District

14      Attorneys as District Attorneys with whom they

15      communicate and negotiate on a daily basis on behalf of

16      their clients, and especially their clients themselves,

17      would be seriously and irreparably harmed if the union

18      adopted and disseminated this Gaza/Palestine resolution

19      as having been adopted as an official position by the

20      union of which my clients are all members.  Each of

21      them also expressed to us that they felt that their

22      solemn professional obligations to the numerous clients

23      that they are charged with the solemn duty are

24      providing legal representation to on a daily basis

25      regardless of their race, color, creed or religion

Proceedings                                    8

1      would be irreparably compromised if the Gaza/Palestine

2      resolution were to be bandied about by the defendant

3      union as being the official position of the union of

4      which they are all members.

5            When my colleagues and I at my law office --

6      this was brand new to us as of last Wednesday, Judge.

7      It's kind of an education.  When my colleagues and I in

8      my law office examined and analyzed these concerns of

9      our clients in the legal landscape in which they all

10     practice as attorneys for indigent defendants from day

11     to day, and in which all Legal Aid lawyers in New York

12     State are laboring day to day, including, by the way,

13     six of the eight defendants who are themselves Legal

14     Aid lawyers, they operate in a legal landscape, Judge,

15     where they are inevitably and constantly coming into

16     the intersection of Gideon v. Wainwright and the

17     absolute right to counsel of indigent defendants under

18     the United States Constitution and the Rules of

19     Professional Conduct in New York that apply to each and

20     every attorney in this state when it comes to providing

21     legal representation to a client.  More specifically,

22     Judge, in connection with discharging their duties to a

23     broad array of defendants, it is their duty to

24     represent each of them and all of them on a day-to-day

25     basis, how can they, without seeking to identify in the

                                                    js

1       holding cell that they enter in every morning, hey, if

2       you are Jewish, stand up because of the resolution that

3       has been adopted by our union I, at a minimum, have to

4       disclose to you that my union has adopted a resolution

5       that calls for the destruction of the State of Israel.

6               Also, Judge, as it relates to the instant

7       proceeding, the adoption of the proposed resolution

8       would deprive plaintiffs of the ability to avoid even

9       the appearance of impropriety and unethical conduct

10      and, again, appearing before judges who are going to be

11      left guessing why they did what they did and are they a

12      part of it, did they vote "yay" or "nay."  There is

13      absolutely no basis in law or in their charter for this

14      union to impose upon its members that kind of burden.

15      This union exists for the very purpose of engaging in

16      collective bargaining county by county with the various

17      Legal Aid Societies on behalf of all of their members

18      and also engaging in ongoing negotiations and

19      interactions with each of those Legal Aid Societies in

20      issues other than collective bargaining.  It manifestly

21      does not include proposing to adopt a resolution on

22      issues having precisely nothing with the mandate that

23      each of them appear in court on day by day and that

24      each of them are bound by Gideon v. Wainwright do

25      properly and, by the way, Judge, in connection with

js

1    each of the county's contracts throughout the state to

2    provide legal services.  The additional dilemma that

3    underpins all of this, and that is a very real one, is

4    that each of the County contracts, and it is certainly

5    true in Nassau as we have shown the court in our

6    papers, there is a mission statement that is attached

7    to each and every Legal Aid contract whereby they

8    contract for services to be provided by the various

9    counties.  In Nassau County for the year 2023, there

10   are four such contracts totaling almost $14 million and

11   in each of them it says that the duty of the lawyers

12   and the mission of the Legal Aid Society pursuant to

13   its contract is to provide legal representation to

14   indigent persons who are entitled to that legal

15   representation.  It doesn't say anything about taking

16   positions on international affairs that would

17   interfere, actually, with that mandate.

18           Judge, the chimera, the red herring of free

19   speech, free speech, free speech that is bandied about

20   repeatedly by the defendants, including in a press

21   release that was issued within about two hours of your

22   Honor's ruling on Friday that we believe actually

23   violates the restraining order that you issued on

24   Friday, and among other things, talks of the court's

25   unconstitutional conduct in restricting their free

Proceedings                          11

1       speech the answer to that is I don't know.  There is no

2       free speech issue here whatsoever.  What this involves,

3       by the way, and ironically enough in the unsworn -- I'm

4       not sure what the first named individual plaintiff

5       thought.  She is an attorney.  I am not sure what she

6       thought she was submitting to the court when she last

7       night submitted to the court the only, other than a

8       memo of law, the only papers that were submitted to

9       this court in opposition to our motion is something

10      called a declaration and it was done by Lisa Ohta,

11      O-H-T-A, who identified herself as the president of the

12      defendant union and she is one of the named defendants.

13              THE COURT:  Hold on.  You don't have the

14      reply affirmation?

15              MR. SMITH:  Pardon me, Judge?

16              THE COURT:  Do you have the reply

17      affirmation?

18              MR. SMITH:  Yes, we do.  We e-filed it last

19      night and we served it accordingly.  And if I may have

20      the court's permission to do so to hand it up.

21              THE COURT:  Not yours.  Do you have the

22      defendant's reply?

23              MR. SMITH:  No.

24              THE COURT:  It was submitted last night at

25      8:40 p.m, is that right?

                                                        js

Proceedings                    12

1          MS. BELOVIN:  That's correct.  You submitted

2     a reply to our opposition.

3          THE COURT:  I asked you to submit to me your

4     papers yesterday.  They came after the work day was

5     finished.  I received them this morning.  I have looked

6     through them.  The time line -- the time of filing was

7     6:45 p.m. yesterday.  Did you receive it?

8          MR. SMITH:  We did, Judge.  We replied at

9     around 8:30 last night.

10          THE COURT:  I have your reply.  Do you have

11     his reply?

12          MS. BELOVIN:  Yes.

13          MR. FELSTINER:  Yes.

14          THE COURT:  Go ahead.

15          MR. SMITH:  Judge, the document that was

16     submitted to this court as the only factual submission

17     in opposition to the instant motion was this thing

18     called a declaration signed by the union president Lisa

19     Ohta, who is herself an attorney, according to the

20     responding papers, six out of the eight individual

21     defendants.  The other two defendants have other rules,

22     a paralegal and an office manager of some sort, but six

23     of them are lawyers.  Every one of those lawyers knows

24     how to swear to something under CPLR 2106 in order to

25     properly submit it to the court.  Every one of those

                                                        js

1     lawyers knows that if they do so and if they lie in it

2     or if they take any position that is contumacious or

3     otherwise frivolous that under Uniform Rules of the

4     Court 130-1.1, they are answerable in the form of

5     sanctions.  All I can think of as a basis for this

6     otherwise incomprehensible declaration having been

7     issued to the court, rather than a sworn statement by

8     anyone, is that they were trying to avoid those

9     sanctions.  But what I do know fundamentally is that

10    they are in default.  They are in default of having

11    summoned by midnight yesterday, the 20th of

12    November 2023, with some sort of factual submission to

13    this court upon which this court can rely because it

14    was properly sworn to and submitted, and they didn't do

15    it.  Even the changes that are imminent in CPLR 2106

16    that go into effect January 1 of 2024 that are going to

17    codify that any person, not just a lawyer or a doctor,

18    any person now as of January 1, 2024 is going to be

19    able to say that they submit this under the penalty of

20    perjury pursuant to 2106.  That statement is not in

21    this so-called declaration, and I can't imagine that

22    that is, and I can't imagine that that is inadvertent.

23            Your Honor, in the event that the court were

24    to deny the continuance of the restraining order that's

25    already in place pending the full hearing and

1    determination of this action or at least pending such

2    interim further order of this court as the court may

3    issue, I have already made, I think, abundantly clear

4    the irreparable harm that will be suffered by not only

5    my four plaintiffs, but Legal Aid lawyers throughout

6    the state.  Ironically enough, including six of the

7    eight defendants.

8              In terms of the balancing of the equities,

9    you know, Judge, it's almost funny if it were not at

10   all funny that what we're talking about is a union

11   representing Legal Aid attorneys in New York who are

12   arguing vociferously that they have some sort of right

13   as a union representing my clients to take a position

14   on Israel, Gaza and Palestine that will absolutely

15   truncate the ability of these attorneys to do their

16   jobs on behalf of a whole category of their -- of the

17   people that they are charged with representing.  It

18   also is literally and existential crisis to the various

19   Legal Aid Societies throughout the state.  County

20   Executive Blakeman in Nassau County wrote a very, very

21   direct response to the Gaza/Palestine resolution and

22   sent it to the union president just a week ago that

23   made this abundantly clear insofar as Nassau County is

24   concerned.  The County and every one of the counties

25   that provide the bulk of the funding for Legal Aid

                                                      js

Proceedings                          15

1       throughout the state at the drop of a hat could cancel

2       their contracts if they felt that the unions were

3       acting in a manner that is inconsistent with their

4       duties.  The provisions of the Code of Professional

5       Conduct, Judge, that are in play here and that we have

6       cited in our papers are -- I don't see any particular

7       reason to repeat them here, but what they have to do

8       with fundamentally is that a client has a right to have

9       an attorney whose own interests are in no manner

10      inconsistent with or contrary to the interests of the

11      client unless that will conflict is revealed to the

12      client in advance of the representation and the client

13      waives the conflict.

14              So I ask again, Judge, and I ask it, by the

15      way, and I don't know if they are in the courtroom, but

16      I hope they are, the six defendants who are themselves

17      Legal Aid lawyers how exactly, how exactly do you

18      propose in the future to do your job as a Gideon v.

19      Wainwright lawyer assigned to represent indigent

20      clients wherever you practice, without first disclosing

21      to them, if this screed is adopted, that it has been

22      adopted and that if you felt the need to have everybody

23      who is Jewish or otherwise offended by it identify

24      themselves.  And, Judge, to be absolutely clear it

25      couldn't matter less, it couldn't matter less, whether

                                                        js

Proceedings                                      16

1     the position espoused was 100 percent pro Hamas or

2     100 percent pro Israel or, for that matter, had

3     something to do with even pro or con Nazis.  You can't

4     do that as a Legal Aid lawyer.  When you come to this

5     intersection in which all of these lawyers practice

6     between Gideon v. Wainwright and your ethical duties to

7     these clients, you can't do it.  There is no free

8     speech issue here, Judge.

9                I state to you, as I approach my closing

10    comments here, and this declaration that the president

11    of this union filed with this court includes a

12    statement that, hey, you know what, if they are

13    aggrieved any one of the plaintiffs can go out and talk

14    to whomever they want to talk about and exercise their

15    right of free speech.  So can the defendants.  What the

16    defendants can do, Judge, they can walk out of this

17    courtroom today locking their arms and goose step out

18    to the parking lot and hold up a megaphone and shout

19    their hateful venom about Israel and about Jews.  They

20    have that right.  What they don't have the right to do

21    as they do so is to chain themselves to my clients and

22    to every other right thinking Legal Aid lawyer who

23    knows that these kinds of positions, regardless of who

24    they are in favor of and who they are against, cannot

25    be taken by a Legal Aid Society that is charged with

                                                        js

1    the duty of representing lawyers throughout the state

2    who themselves are charged with the solemn duty of

3    representing all manner of clients under Gideon v.

4    Wainwright regardless of race, color, creed or

5    religion.

6           In closing, Judge, on the other side, I can't

7    even conjure what I'm going to hear because it sure is

8    not in their papers what's the irreparable harm that

9    could possibly be suffered by a union representing this

10   group of people if they are stopped from adopting a

11   Gaza/Palestine resolution.  What are the balancing of

12   the equities in their favor by which this court

13   respectfully could possibly rule that the equities are

14   in their favor and not on the other side?  Where is

15   their likelihood of success on the merits?  Judge, we

16   have two very carefully crafted causes of action in the

17   underlying action, none of which have been addressed in

18   any of the papers that were submitted to the court by

19   the defendant's counsel and by the president of the

20   union, and that is the duty of fair representation to

21   the union members and breach of contract.

22          Again, Judge, I am all ears waiting to hear

23   how any of what they are proposing to do here is in any

24   way consistent with those duties because I know that

25   what they are proposing to do here is fundamentally not

Proceedings                    18

1      and the harm that will be transacted upon each of my

2      defendants, each of my plaintiffs, pardon me, and of

3      all other persons similarly situated to them who are

4      Legal Aid lawyers, is profound and probably

5      irreversible in the event that they are allowed to go

6      ahead with their plan to issue this screed.

7                I thank you, your Honor.

8                THE COURT:  Thank you.  Defense.  You can

9      take the lecturn as well.  No time limit.

10               MR. FELSTINER:  Good morning, your Honor.

11               THE COURT:  Good morning.

12               MR. FELSTINER:  I would like to state at the

13     outset, and I think statements of plaintiff's counsel

14     demonstrate this is a very complex issue with deep

15     feelings on the different sides.  Defendant union,

16     known as the ALAA, is attempting to deal with it

17     through internal Democratic processes contrary to the

18     plaintiff's assertion.  Neither the union, nor the

19     individual defendants have, quote/unquote, adopted this

20     document.  The process is still ongoing.  We submit

21     that the court should allow that process to continue

22     without judicial intervention.  That is the proper and

23     appropriate method for a private organization to

24     determine through a body, through a vote of its

25     membership body what position it chooses to take on

                                                      js

1    this issue of public concern.

2            You will note that plaintiffs do not seem to

3    contend that the union or the individual defendants

4    disobeyed or short-circuited any of the bylaws in

5    bringing this matter to a vote, and that's because the

6    union, in fact, did follow its internal procedures.

7    And that question of what the union did in responding

8    to a request from the membership and the elected

9    delegates of the union to speak on this issue goes

10   directly to the underlying causes of action in this

11   case, which are the duty of fair representation and the

12   breach of contract.  And I will speak about those in

13   due course.  They received virtually no attention in

14   plaintiff's oral argument today and that's because

15   there's absolutely no claim on either.

16           But I'm going to start with the

17   constitutional question because of the absurdly short

18   shrift that plaintiff's counsel gave to the free speech

19   rights of the defendant union and its members.

20   Defendant submits that extending this temporary

21   restraining order would be unconstitutional.  I will

22   start by noting under the bylaws of this organization

23   the members have the highest authority in their union.

24   Their authority exceeds the authority of the officers

25   or any of the elected delegates and they are entitled

1    to use that authority to express statements on issues

2    of public concern.  Plaintiffs may not wish the union

3    to make these statements, but the union and its members

4    are entitled to make these statements, if they so

5    choose.  You will see in the bylaws, in fact, that the

6    union's mission statement is not limited to bargaining

7    contracts and negotiating grievances, that the union is

8    empowered under its bylaws to address the welfare of

9    the members to address the political and cultural

10   beliefs of the members and to represent them in the

11   public's sphere.  In this case, members drafted a

12   statement on a matter of public concern, presented it

13   to the union leadership through their elected

14   delegates.  The union did not disregard it, but gave it

15   a due hearing at a meeting of the Joint Council in

16   which all of the elected delegates had a duty to

17   participate and all the membership had an opportunity

18   to participate because it was an open meeting.  After

19   debate, the Joint Council voted to put the issue before

20   the full membership.  All of this was consistent with

21   the union's constitution and bylaws.  And I mention

22   that because that is actually the issue in the

23   underlying causes of action, not the content of the

24   resolution, but whether the union carried out its duty

25   of fair representation to the members, however, I will

1          speak on the constitutionality of the requested

2          restriction because this case shouldn't go any further

3          than that.

4                    Each member has a right to express their

5          views by voting.  The union itself has a right to

6          express its views on this public concern issue.

7          Supreme Court has made clear that nonpersons have free

8          speech rights equivalent to persons, at least on these

9          type of issue.  And voting, as well as publishing a

10         resolution like this, is an expressive act.  You are

11         taking a position for or against the statement that has

12         been drafted by one of the chapters.  So what

13         plaintiffs are asking this court to do is a classic

14         example of prior restraint, asking the court to

15         restrain the members from voting and to restrain the

16         union from expressing its position.  Prior restraint is

17         reserved for things like national security.  Members

18         are not voting on whether the Pentagon papers should be

19         released.  They are voting to take a statement on an

20         issue of public concern that is extremely critical and

21         important, presumably to the plaintiffs, certainly to

22         the members of the union that presented this resolution

23         and argued about it and ultimately voted to present it

24         to the membership.

25                    I also will point out that plaintiffs are not

Proceedings                    22

1    asking the court to enjoin the vote or suppress the

2    resolution because of the topic.  They are asking the

3    court to suppress the resolution because of the

4    viewpoint expressed.  This is viewpoint discrimination.

5    It has been identified as the most egregious form of

6    content based restriction on speech.  It targets a

7    specific viewpoint for suppression and says because of

8    what this resolution says it cannot be published.

9    People cannot vote on it.  Now, plaintiff's made a big

10   deal out of the fact that defendants -- individual

11   defendants or lawyers, individual plaintiffs are

12   lawyers as well.  Probably that entire group is aware

13   that content based restrictions on speech must survive

14   strict scrutiny, which means it has to be necessary to

15   achieve a compelling government interest.  And if you

16   are going to go after speech like that it also has to

17   be narrowly tailored to accomplish that interest.  None

18   of those elements are present here.  And neither I nor

19   the defendants mean to question the sincerity of

20   plaintiff's personal grievance that they felt

21   aggrieved, that they were concerned about the

22   imputation of prejudice, that they were concerned about

23   harm to their reputation.  All of those things may be

24   true.  Those are not compelling government interests.

25   They simply are not.  There is a single government

 1        interest that has been identified, which is the

 2        provision of defense to indigent defendants.  That is a

 3        government interest.  I would suspect that both

 4        plaintiffs and defendants and the membership of the

 5        union share the belief that that is an important

 6        government interest.  However, this injunction is not

 7        necessary to protect that interest and that is the

 8        standard.  It's not tailored to protect that interest.

 9        It is very dubiously related to that interest.  The

10        nightmare scenario that plaintiffs presented to you of

11        a defendant -- a defense attorney going into a holding

12        cell and having to identify, I suppose, all of the

13        defendants in the cell that are Jewish or might take

14        offense to the resolution and then disclose that they

15        are members of a union that made the statement, it's

16        speculative and does not in any way relate to the

17        court's responsibility in this case.  Unless plaintiffs

18        themselves hold a belief that would interfere with

19        their ability to provide competent and loyal

20        representation, this potential conflict that plaintiffs

21        are talking about does not exist.  And the appearance

22        of conflict depends on this client or this judge or

23        this, I guess, professional colleague imputing a

24        statement from this Democratic organization onto every

25        one of its members.  That is not how Democratic

1    organizations work.  If that is how they worked, then

2    plaintiffs would have to give a disclosure about every

3    statement made by every organization they belong to and

4    so would every other lawyer who practices in this area.

5    That is simply not the responsibility of an attorney

6    when attempting to provide conflict free

7    representation.  The responsibility is to identify if

8    there is anything either apparent or real that would

9    create a conflict with their ability to provide

10   competent loyal representation.  That is not the case

11   here.  So what you end up with are personal grievances,

12   reputational harms, concern about being imputed as

13   prejudice based on the fact that a union made a

14   statement and you as an attorney are represented by

15   that union.  That is not a compelling government

16   interest.  And as I will get to when I discuss the TRO

17   factors, it is also not an irreparable or immediate

18   harm.

19           I would like to move to the merits of the

20   case.  Although we believe that the court is foreclosed

21   from issuing this injunction based on the First

22   Amendment rights of the union and its members, I will

23   address the merits since I believe that the court

24   deserves to hear a little bit about the causes of

25   action that the plaintiffs bring here.

Proceedings                          25

1           They bring, first, duty of fair

2     representation.  Second, a breach of contract.  Here is

3     the problem with the duty of fair representation claim.

4     There is no conduct alleged that could establish a

5     breach of this duty.  And I would ask the court to

6     think about what is this duty.  It's a fiduciary duty

7     that the union provides to its members.  When you claim

8     a breach of a duty, you need to identify what is the

9     duty that defendants owed to the plaintiffs and the

10    rest of the membership?  What is that duty?  Under the

11    plaintiff's conception, did the defendants have a duty

12    to disobey their own union bylaws?  So there is a

13    properly submitted request for a resolution to come

14    before the membership.  According to the plaintiffs, I

15    suppose, the defendant's duty here was to disregard

16    that request.  Were defendants supposed to exclude

17    delegates from presenting the resolution to prevent

18    them from arguing over it, to prevent them from putting

19    it to a vote?  And once they had put it to a vote, were

20    defendants expected under plaintiff's conception of

21    this duty, to nullify that vote, disregard it, not send

22    it to the membership?  If you want to talk about a

23    breach of the duty of fair representation, that would

24    be one.  Were the defendants supposed to tell the

25    members, listen, your elected delegates want you to

1    vote on this and they followed the proper procedures

2    and it was approved by the Joint Council, but we are

3    just not going to let you do it.  That is apparently

4    the duty that they were expecting defendants to carry

5    out.  It's completely contrary to the defendant's

6    obligations as officers of the union.  I speak here on

7    behalf of the individual defendants.  In terms of the

8    union's responsibility, the union's responsibility is

9    to follow the bylaws and the highest responsibility in

10   the union is the members.

11          Now, in terms of the components of a duty of

12   fair representation claim, here is the way you can do

13   it.  You can argue that the union acted in bad faith.

14   You can argue that the union acted arbitrarily or you

15   can argue that the union acted discriminatorily.  Those

16   are the options.  None of them are met.  There is no

17   indication or even allegation of bad faith.  There is

18   no suggestion that any of the individual defendants

19   misrepresented anything or concealed anything.  Their

20   conduct wasn't arbitrary.  In fact, it was the

21   opposite.  Arbitrary conduct might be to throw this

22   resolution out there without seeing whether anybody was

23   interested in it.  Arbitrary conduct would be to

24   disregard the vote and decide we are not going to put

25   this to the membership even though the elected

Proceedings                               27

1    delegates ordered us to do so.  Union followed its rule

2    respective to voting of their elected delegates and

3    placed the issue before the membership.  That is not

4    arbitrary.

5              Finally, discriminatory.  Discriminatory

6    conduct requires that plaintiffs be deprived of their

7    membership rights in some way or suffer an adverse

8    impact on under the terms and conditions of work.

9    There has to be some kind of loss or injury.  Simply

10   disliking the statements or beliefs of a union is not

11   discrimination.  Disagreeing is not discrimination.  A

12   union is not required to account for and represent the

13   personal beliefs of every single member.  They are

14   required to treat them fairly and equally and that is

15   what happened.  Plaintiffs had an opportunity to

16   participate in this debate.  Plaintiffs had an

17   opportunity to vote.

18             Finally, to make out a DFR claim, duty of

19   fair representation, pardon me, I refer to it

20   colloquially as a DFR, there has to be an injury or

21   loss.  In other words, even if you could show that

22   something happened that was in bad faith or arbitrary

23   or discriminatory, there still has to be an injury or a

24   loss.  It cannot be speculative.  It cannot be the

25   possibility of reputational harm.  It cannot be the

                                                    js

Proceedings                    28

1     personal grievance felt when your union takes a

2     position that you disagree with.  Perhaps that offends

3     you.  Maybe I am unselling it.  If the union takes a

4     position that offends you personally and deeply, that

5     is still not an injury or a loss that is cognizable

6     under Federal Labor Law.  It's a breach of the union's

7     fiduciary duties.  Because the duty does not include

8     making sure that everybody is not offended.

9               As to the contract claim as we explained in

10    our papers, it's foreclosed on a number of grounds.

11    First, it's preemptive.

12              THE COURT:  I want you to address his claim

13    that CPLR 2106 hasn't been complied with.

14              MR. FELSTINER:  Certainly.  I will say, in

15    the first instance, that our defendant, Lisa Ohta -- I

16    assume you are referring to the declaration that was

17    submitted?

18              THE COURT:  No.  He is saying your papers

19    were improperly submitted.  They weren't sworn to, and

20    that the only document that was addressing the issue

21    was an unsworn document, is that right?

22              MR. SMITH:  Yes, your Honor.

23              MR. FELSTINER:  I will say on behalf of

24    defendants our understanding was that we were in

25    compliance because the declarant is, indeed, a licensed

1      attorney and would be permitted to issue declaration.

2      If there was a procedural error there, it was

3      inadvertent.  Unfortunately, I would need to review

4      that section of the CPLR in order to ensure that we

5      were complying in order to rectify any issue, but I

6      will say that the memorandum of law addresses our

7      arguments and can be applied to the factual material

8      that was submitted by the plaintiffs.

9                  THE COURT:  Okay.  You can continue.

10                 MR. FELSTINER:  Thank you.  In terms of the

11     breach of contract, it's preemptive by Federal Labor

12     Law.  What defendants are claiming here is that there

13     is a contract created by the bylaws and that the union

14     and the individual -- sorry, plaintiffs are claiming

15     here.  There is a contract created and that the

16     individual defendants and/or the union breached that

17     contract in some way.

18                 Let's assume for the moment that the union's

19     bylaws do create an enforceable contract.  The claim is

20     a challenge to the union's representation.  Did the

21     union represent people?  According to the bylaws, that

22     is the exact same claim as did the union breach its

23     duty of fair representation.  And for that reason, the

24     courts will preempt claims of this type.  It has

25     happened.  It should happen here.  You have a Federal

1       and State scheme dealing with the exact same conduct

2       under the supremacy clause Federal Labor Law that

3       defines the union's duty must prevail.  Union cannot be

4       attempting to comply with the federal duty and then be

5       subject to liability for breach of contract when it's

6       the exact same representational conduct.  This claim is

7       also foreclosed by the General Association Law Section

8       13 and the well-known New York Court of Appeals case

9       Martin v. Curran in for any state law claims of this

10      type against an unincorporated association, the

11      plaintiffs must allege authorization ratifications by

12      every member.  They haven't done so here.  They can't

13      do that here, so the claim is foreclosed.

14              Finally, if the plaintiffs could get around

15      both of those, you have a problem with the basic

16      elements of a breach of contract.  You have to identify

17      an enforceable promise.  The aspirational language in

18      the union's bylaws that says that the union will

19      attempt to secure the reputation -- excuse me, the

20      ability of members to provide high quality legal

21      services, that's not an enforceable promise.  What you

22      need is an enforceable promise to, I suppose, nullify a

23      vote, to prevent a resolution like this from being sent

24      to the membership.  That is the promise that they are

25      claiming that the union made somehow in this

Proceedings                        31

1    constitution.  It is not there.  You don't have

2    enforceable promise in a breach of contract claim.  You

3    don't have certain damages and other requirement for a

4    breach of contract claim.  You have speculative

5    reputational harm, speculative conflict in the

6    provision of indigent defense.  You have personal

7    grievance.  That's not a contract claim.

8              So under the TRO factors, the first one,

9    perhaps the most important in this case, is the

10   plaintiffs have no possibility of succeeding on the

11   merits, cannot extend a TRO.  The plaintiffs have no

12   possibility of proving a breach of the duty of a fair

13   representation or a breach of contract.

14             Second factor is the harm.  And I want to

15   make clear in addressing this that the defendants do

16   not intend to minimize any of the feelings that

17   plaintiffs may have felt in response to reading this

18   resolution.  The problem is that the cognizable harms

19   are speculative, not the personal dignitary harms.

20   They may have been immediate and they are subjective,

21   but the cognizable harms that the court could remedy

22   are far too speculative and attenuated to justify this

23   kind of injunctive relief.  What plaintiffs are saying

24   is that unrelated third parties will have a injurious

25   reaction.  Judges will wonder about the allegiance of a

Proceedings                        32

1    particular attorney based on the fact that their union

2    made a statement.  That's not imminent harm.  It's not

3    immediate.  It's speculative.  It's not saying that any

4    of those things is impossible in every case.  What I am

5    saying is that the harm has to be immediate.

6    Plaintiffs are, essentially, asking the court to take

7    judicial notice of this supposed backlash as if it's a

8    scientific fact or a law of physics.  That's not the

9    standard that the court is obligated to apply when

10   issuing injunctive relief, let alone prior restraint of

11   free speech.  It can't be based on anecdotes.  It can't

12   be based on specter.

13             THE COURT:  Will it create a conflict for

14   Legal Aid attorneys?

15             MR. FELSTINER:  Not if they don't have

16   personal conflict.  If a Legal Aid attorney is able to

17   provide competent and loyal representation, then

18   issuance of a statement by their outline creates no

19   conflict.

20             THE COURT:  Plaintiff says that the Legal Aid

21   attorneys will have an obligation to disclose the

22   contents and the possible conflict.

23             MR. FELSTINER:  Defendants disagree.

24             THE COURT:  Why?

25             MR. FELSTINER:  Because there is -- let's

1    take it actual versus apparent.  If there is no actual

2    conflict, then there is no duty to disclose any issue

3    that plaintiff or any other Legal Aid attorney would

4    have.  The problem, I believe, that they are invoking

5    is an apparent conflict.  The idea is an organization

6    makes a statement and then the contents of that

7    statement is automatically imputed to every single

8    member.  That is the idea.  However, it's a Democratic

9    organization.  There is no reason, and I could find no

10   basis in the Professional Ethics Rules, that an

11   attorney is required to disclose the statements of

12   every single organization to which they belong on the

13   possibility that those statements might create the

14   appearance of a conflict prior to representing a

15   client.  I would also add this is a democratic

16   organization.  Democratic organizations are going to

17   take positions and individual members will disagree

18   with them on occasions.

19            THE COURT:  I like to ask questions.  Don't

20   think because I ask one side more questions, one side

21   less, I want as much information as I can get today.

22            MR. FELSTINER:  Understood, your Honor.

23            THE COURT:  From your arguments, your papers

24   I have to go through very carefully, but I want to

25   flush this out so I know what issues to look at.

1              MR. FELSTINER:  Thank you, your Honor.  I

2    just had one further point to make and then I will

3    conclude, if that's all right.

4              THE COURT:  By the way, has this

5    organization, this union, ever issued any sort of

6    resolution on any issue?

7              MR. FELSTINER:  I am not prepared to specify

8    ones.  The answer to that question, in general, is yes.

9              THE COURT:  On what issue?

10             MR. FELSTINER:  I am afraid I can't speak to

11   specifics.

12             THE COURT:  Outside the function of the, what

13   I would say, the general duties of the union, which is

14   collective bargaining.

15             MR. FELSTINER:  I don't know the answer to

16   that, your Honor.

17             THE COURT:  Okay.

18             MR. FELSTINER:  It is something that if it

19   were relevant to the inquiry, we would be prepared to

20   brief that question and present additional evidence.

21             THE COURT:  Is this case different than

22   others in dealing with free speech because we are

23   dealing with attorneys who owe a duty to clients, have

24   professional responsibilities, I think DR9 would apply

25   to this.  Did you preview those sections?

Proceedings                    35

1          MR. FELSTINER:  Briefly, I think, I could

2     say.

3          THE COURT:  I just wonder, and I'm going to

4     examine how that interplays with the arguments being

5     made by both sides today.  And you can address it, if

6     you would like.

7          MR. FELSTINER:  Well, I think for the moment

8     here I will simply say that the State has, and this is

9     a point that was made in our brief, the State has

10     already taken certain measures to ensure that

11     plaintiffs and other Legal Aid attorneys are providing

12     conflict free and competent and loyal representation,

13     including the rules of professional conduct that we

14     certainly would endorse any plaintiff, as well as any

15     of the defendants and any of the members.  The

16     statement of the union doesn't fall into any category

17     that requires a disclosure or that will interfere with

18     the, generally speaking, with the Legal Aid attorney's

19     ability to provide conflict free representation.  The

20     reason I say generally speaking is because individual

21     attorneys do have a duty to, pardon the language, look

22     inside themselves and determine if they have a

23     conflict.  In other words, if they have a conflict

24     independent of the appearance of conflict, they are

25     obligated to disclose that.  If for some reason the

Proceedings                    36

1    issuance of this resolution prevented plaintiffs from

2    representing somebody competently and loyally, I

3    suppose they would have a duty to disclose that.  I

4    would also note that this is a voluntary organization.

5    Plaintiffs are free to resign membership.  Plaintiffs

6    are certainly free to oppose the resolution and

7    communicate their opposition to the resolution and from

8    our perspective that would certainly take care of any

9    personal responsibility they have to ensure that

10   clients don't exceed the appearance of a conflict.

11              THE COURT:  Okay.

12              MR. FELSTINER:  The last point I just wanted

13   to address, because it's the very prong in the TRO

14   factor, is the balance of the equities, and this was

15   addressed by plaintiff's counsel.  I think I will start

16   by saying it seems clear from plaintiff's counsel and

17   defendants have no reason to doubt that plaintiff's

18   experience deep discomfort associated with this

19   statement.  They may feel deep discomfort being

20   associated with the union if the union ultimately votes

21   to support or publishes this statement.  I believe that

22   is what sits on their side of the scale.  On the other

23   side is the protected speech and rights of the rest of

24   the members and, in fact, the plaintiffs as well to

25   vote on this resolution and the union to take this

Proceedings                    37

1    position.  Those are not minimal, despite having been

2    minimized by plaintiff's counsel, they are enshrined in

3    the Bill of Rights. If a vote occurs and the resolution

4    is approved, as I said, plaintiffs can resign from

5    union membership, they can publicly oppose the union's

6    position.  That right is guaranteed in the

7    international union constitution.  If the court enjoins

8    this vote, the members can't vote.  As a body on the

9    issue, they cannot express their collective position.

10   This is the nature of Democratic organizations;

11   sometimes people disagree.  But the balance of the

12   equities can't prevent freedom of speech.  With that, I

13   will conclude.

14           THE COURT:  By the way, before you end, what

15   number paragraph or section of the constitutional

16   bylaws do you believe gives this union the right to

17   hold this vote?  Do you have a specific section?  I

18   read the constitution and the bylaws already.

19           MR. FELSTINER:  It's the section that gives,

20   and I believe it's in Article 4, the members of the

21   highest authority in the union.  Once the membership

22   presents the matter for consideration by the Joint

23   Council, the Joint Council is obligated to consider it.

24   If the Joint Council votes that the resolution should

25   be placed before the full membership, that must be

js

Proceedings                              38

1      done.  So there isn't a specific section of the

2      constitution that says the union is permitted or

3      precluded from speaking on this issue or that issue.

4      There is language in the mission statement that speaks

5      to the general purpose of the union and that is

6      certainly encompassed by making statements of the type

7      that the resolution of the type contained in the

8      resolution.  I also point out the resolution does not

9      only address the violent conflict in Gaza and

10     Palestine.  It also addresses the union's solidarity

11     with other unions and other members that are

12     experiencing retaliation as a result of political

13     speech.  It pledges to organize in solidarity with

14     those members.  This is pretty classic collective

15     action that members are entitled to engage in.  We

16     don't focus on the content of resolution of this

17     purpose, and to the extent the court inquires into

18     that, it should be understood that it is not simply a

19     comment on what is happening across the ocean.  It's

20     also a comment on what is happening right here in New

21     York State with respect to the political speech of

22     members.

23                   THE COURT:  Plaintiff.

24                   MR. SMITH:  May I, your Honor?

25                   THE COURT:  Counsel for the defense claims --

Proceedings                    39

1            MR. SMITH:  Your Honor, we have addressed --

2            THE COURT:  Hold on.  I have some questions

3    for you.  Counsel set forth an argument.

4            MR. SMITH:  Pardon me, Judge.

5            THE COURT:  Counsel has argued --

6            MR. SMITH:  Yes.

7            THE COURT:  -- that free speech allows the

8    union to issue this resolution.  What say you?

9            MR. SMITH:  What we say, Judge, is that there

10   is no defendant in this case, no other member of the

11   union who can't, on their own time, 16 hours a day,

12   Monday through Friday when they are not working, and 24

13   hours a day on Saturday and Sunday when they are not

14   working, and go out and espouse whatever fowl orthodoxy

15   they want to espouse.  What they cannot do in the name

16   of so-called free speech is to attempt to impose upon

17   their union members as a whole a method of speech that

18   is expressly violative of precisely of what this union

19   exists to do in the first place.  By the way, Judge, we

20   did put together last night reply papers and at

21   paragraph 18 of our reply papers we cite from the

22   defendant's own constitution, the UAW constitution at

23   Article 19, quote, "No officer, member, representative

24   or agent of the international union or of any local

25   union, in this case the ALAA, or of any subordinate

                                                     js

1     body of the international union, shall have the power

2     or authority to counsel, cause, initiate, participate

3     in or ratify any action which constitutes a breach of

4     any contract entered into by a local union or by the

5     international union or a subordinate body thereof",

6     closed quote.  Everything that each of these Legal Aid

7     lawyers do, including the six of the defendants who are

8     themselves Legal Aid lawyers, is done under the

9     auspices of a local contract between the various Legal

10    Aid Societies, in this case Nassau County.  And, by the

11    way, we have the Chief Attorney of Nassau Legal Aid,

12    Scott Banks, here today.  It is a contractual duty of

13    each of them to carry out their solemn duties under

14    Gideon v. Wainwright.  And, Judge, you know, it's

15    patently offensive to characterize these fervent

16    objections that my feelings have as feelings and

17    inchoate.  There is nothing inchoate and nothing that

18    are feelings about this.  These are the obligations

19    that these Legal Aid lawyers, including the six

20    defendants who are Legal Aid lawyers, have to these

21    people each and every day.

22             In terms of the free speech, Judge, what was

23    incumbent, if I may, upon this union, immediately upon

24    allegedly being approached by union members that they

25    have this concern about Gaza and Palestine, go down the

                                                      js

1    block.  This ain't our issue.  This union has no

2    business becoming involved in this in the first place.

3    When the union undertakes to do so, it cannot sit here

4    and ring its hands before the Court and say, oh, woe is

5    me.  We find ourselves in this dilemma because our

6    union members wanted to vote on this.  Nonsense.  You

7    tell them it's not our issue.  You tell them our

8    constitution does not allow it.  You tell them we are

9    not auto workers here.  Even though we are part of the

10   United Auto Workers Union, we are all lawyers.  Go look

11   at the Rules of Professional Conduct and you will see

12   why this union cannot take a position on this in the

13   name of free speech.  Judge, in terms of this screed, I

14   will now call it, because that is what it is, it is

15   full of thin legal, very thin legal arguments for the

16   absolute destruction of the State of Israel.  This is

17   not some speculative worry on my client's part that

18   this resolution, if allowed to go to a vote and

19   adopted, is going to create for them a conflict with

20   their clients.  Nothing is speculative about that.  And

21   the Rules of Professional Conduct counsel may seek to

22   belittle this, but the Rules of Professional Conduct

23   will require each and every Legal Aid attorney,

24   including these six defendants, to disclose to any

25   potential client in advance of their representation.

Proceedings                         42

1    What's going on here?  Everyone in this holding pen who

2    is Jewish, please raise your hand.  That is what they

3    are going to have to do.  That is the position that

4    this union has put them in and it's an absolutely ultra

5    virus act on their part.

6            Judge, the hand ringing about First Amendment

7    rights is totally misplaced here.  And, again, there is

8    nothing that this court has done or that we are asking

9    this court to do, which will, in any way, interfere

10   with the very clear right of any of those defendants to

11   speak as they wish in whatever public forum that they

12   wish.  Just don't drag down all of the Legal Aid

13   Societies with you in the name of "free speech."

14           THE COURT:  Hold on.  I want to ask you a

15   question.  This is one question I am going to deal with

16   is the powers of the union.  He says the union has the

17   power pursuant to the constitution and bylaws to issue

18   this resolution.  What is your response?

19           MR. SMITH:  My response is we are not talking

20   about auto workers here who are assembling cars.  Every

21   power that this union has is circumscribed by the Rules

22   of Professional Conduct that apply to the vast majority

23   of the members.  Not all, but the vast majority of them

24   who are lawyers in New York State and they have got to

25   review what they can and cannot do with the overlay of

                                                        js

1        how what they are proposing to do intersects with the

2        Rules of Professional Conduct.  And, in this case, it

3        is absolutely prohibited for them to do this in the

4        first instance and they can't come to this court

5        ringing their hands when they do do it and say, oh, woe

6        is me.  We are in this position as a result of

7        membership.  Nonsense.  Like I said, when the members

8        come in and you tell them that they want you to take a

9        position on Gaza or even being anti-Nazi or even being

10       the most ardent supporter of Netanyahu in the world, we

11       couldn't do it.  We can't do it because it interferes

12       with Gideon v. Wainwright and with the Rules of

13       Professional Conduct.  They are not auto workers even

14       though they are part of the Auto Workers Union and

15       that, judge, is my ultimate answer to this chimera of

16       issues that they raised.  We are not seeking to

17       restrict anyone's free speech.  We are seeking to have

18       this court stop them from dragging down all Legal Aid

19       Societies with them and the individual plaintiffs in

20       this case.  Thank you, your Honor.

21              THE COURT:  Thank you.  Would you like to

22       reply?

23              MR. FELSTINER:  Yes, your Honor.  Thank you.

24              I would start by saying that in addition to

25       each of the defendants and any member having the right

                                                          js

Proceedings                         44

1      to speak, the union as an organization has a right to

2      speak.  The union as an organization has a right to put

3      forth its position on issues of public concern.  It can

4      speak in opposition to the discrimination on the basis

5      of their politics.  It can speak in politics.  It can

6      speak in opposition to the policies of United States

7      Government.  It would, by no measure, be the first

8      union to speak to the issues.  It can speak in

9      opposition to policies of other governments.  That is a

10     right that the union enjoys.  That is a right that the

11     individual members enjoy, and they can exercise that

12     right through voting as a body.

13              Now, plaintiff's counsel intimated that the,

14     let's say, the permissible scope of action that the

15     union and its officers can take under the bylaws are

16     circumscribed by the Rules of Professional Conduct.

17     They are, essentially, asking you to read the bylaws

18     and anywhere that they allege -- a union action may

19     interfere with the Rules of Professional Conduct, you

20     would then preclude the union from acting.  That is not

21     the way that the First Amendment works.  So I invite

22     the court to take a look at the bylaws.  Nowhere in the

23     bylaws is a resolution of this type prohibited.

24     Nothing in the resolution itself violates the union

25     contract or any of the employee's contractual duties to

                                                      js

Proceedings                                45

1     carry out their solemn vote.

2             Plaintiff's counsel stated that it was

3     incumbent upon the individual defendants as

4     representatives of the union to send the members down

5     the block.  According to what?  The constitution says?

6     We can't do this resolution so I have to send you down

7     the block.  Federal law?  Nope.  Duties of professional

8     responsibility?  Nope.  That's simply not a duty that

9     this union had or that any of the individuals had.  It

10    is a strong preference that the plaintiffs wished.

11    It's not the same thing.

12            THE COURT:  All right.  Just some

13    housekeeping.  Everyone done?

14            MR. FELSTINER:  Yes.

15            THE COURT:  Plaintiff submitted a reply.

16    Typically, a reply is not permissible on the return

17    date of a TRO.  Do you have any objection to the court

18    considering the reply with the understanding you will

19    get to respond to this reply affirmation?

20            MR. FELSTINER:  No objection, your Honor.

21            THE COURT:  So the court will allow the reply

22    that was submitted 8:40 p.m. last night, November 20.

23    Counsel, how much time do you need to submit a reply?

24    I know the holiday is coming.  I will give you until

25    next week.

                                                      js

Proceedings                    46

1           MR. FELSTINER:  Perhaps Monday, your Honor.

2           THE COURT:  I will give you until Tuesday.

3      What date is Tuesday?

4           MR. FELSTINER:  Thank you, your Honor.

5           THE COURT:  What date is Tuesday?

6           THE CLERK:  The 28th.

7           THE COURT:  November 28 to submit a response

8      to plaintiff's reply affirmation.

9           MR. FELSTINER:  Your Honor, I have another

10     request.  To the extent that the declaration of Lisa

11     Ohta was not properly sworn, we request the court's

12     leave to resubmit it in compliance with the CPLR.

13          THE COURT:  Any objection?

14          MR. SMITH:  Yes, your Honor.  That train has

15     left the station.  These are lawyers.  These are

16     lawyers who know very well what the requirements of

17     2106 are.  This court's order was that it could have

18     even been 11:59 last night on November 20 that any

19     responding papers be submitted by then.  They can't

20     retroactively cure that by placing a 2106 stamp on

21     what's already been submitted.  That default cannot be

22     cured and least of all, with all due respect, should

23     the court consider allowing it to be cured on the part

24     of a lawyer who knows better in the first place.

25          THE COURT:  It's my intention to determine

                                              js

Proceedings                    47

1    this case on the merits.  And that would not happen if

2    I was to rule that the defense is now prohibited from

3    filing any additional papers or correcting the error

4    you pointed out.  I don't know if it is a fact.  I

5    haven't looked at the papers directly, but I am

6    assuming that you are correct that you submit an

7    unsworn documents in support of your application.  I

8    will allow you to correct it.  The court has inherent

9    authority to do so.  I will determine this on the

10   merits and not waste anyone's time because I don't want

11   to have to have a refiling of the action and I will

12   determine this case on the merits.

13            I have a lot of work to do.  I will go

14   through every one of these papers of what each of you

15   have submitted, look at the bylaws, the constitution

16   and all the case law, and make the determination.

17            As far as today is concerned, the TRO will

18   continue until such time as a decision is issued by

19   this court.  I am going to set a control date 35 days

20   from today.  I expect to have my decision within the

21   statutory prescribed 30-day period.  So the TRO remains

22   in effect.  There shall be no union vote until further

23   order of this court as to its decision.

24            That constitutes the decision and order of

25   this court today.  I want to thank both sides.  I know

Proceedings                                48

1        you have worked extremely hard and diligent on behalf

2        of your clients, and I appreciate the professionalism,

3        and I will do my best to get this right in accordance

4        with the law.  So with that, I wish all of you a happy

5        and healthy holiday season, and good day.

6                    MR. SMITH:  Thank you, your Honor.

7                    MR. FELSTINER:  Thank you.

8                    MR. SMITH:  Thank you very much, your Honor.

9                    (Proceedings concluded.)

10                         *          *          *

11   I hereby certify the above and foregoing to be a true and
     accurate record of my stenographic notes.

12

13   _____

14   JENNIFER A. SCHMIDT, C.S.R.

15

16

17

18

19

20

21

22

23

24

25

                                                          js