**FILED**
**CLERK**

12/26/2023 2:40 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DIANE T. CLARKE, et al.,           *    Case No. 23-CV-08869(NJC)
                                   *
            Plaintiffs,            *    Long Island Federal
                                   *     Courthouse
    v.                             *    100 Federal Plaza
                                   *    Central Islip, NY  11722
THE ASSOCIATION OF                 *
 LEGAL AID ATTORNEYS,              *
 AMALGAMATED LOCAL UNION           *    December 15, 2023
 2323 OF THE INTERNATIONAL         *
 UNION, UNITED AUTOMOBILE,         *
 AEROSPACE AND AGRICULTURAL        *
 IMPLEMENT WORKERS OF              *
 AMERICA (UAW), AFL-CIO,           *
 et al.,                           *
                                   *
            Defendants.            *
                                   *
* * * * * * * * * * * * * * * *


            TRANSCRIPT OF CIVIL CAUSE FOR MOTION HEARING
             BEFORE THE HONORABLE NUSRAT J. CHOUDHURY
                  UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:             SARA RAISNER, ESQ.
                                JEFFREY D. HOSCHANDER, ESQ.
                                Shearman & Sterling, LLP
                                599 Lexington Avenue
                                New York, NY  10022


For the Defendants:             ALEKSANDR L. FELSTINER, ESQ.
                                ALLYSON L. BELOVIN, ESQ.
                                Levy Ratner, P.C.
                                80 Eighth Avenue, 8th Floor
                                New York, NY  10011


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**Shelton, CT 06484 (203)732-6461**

2

(Proceedings commenced at 2:05 p.m.)

MS. RAISNER:  (Delay in start of audio) Lexington Avenue, New York, New York, 10022.

THE COURT:  Nice to meet you.

MR. HOSCHANDER:  Good afternoon, Your Honor.  Jeff Hoschander from Shearman on behalf of the plaintiffs.  Thank you.

THE COURT:  Nice to meet you as well.

MR. HOSCHANDER:  And you.

MR. FELSTINER:  Good afternoon, Your Honor.  Alek Felstiner, Levy Ratner, 80 Eighth Avenue, 8th Floor, New York, New York, 10011, for defendants.

THE COURT:  Thank you.

MS. BELOVIN:  Good afternoon, Your Honor.  Allyson Belovin also of Levy Ratner for defendants.

THE COURT:  Okay.  Thank you. So nice to meet you all, Counsel.  Thank you all for being here.

And also welcome to the members of the public who have attended as well, including parties to this action.  We appreciate your attendance.

So, as everyone should know, this litigation concerns claims brought by four individual plaintiffs, Diane Clarke, Llana Kopmar, Isaac Altman and David Rosenfeld, against nine defendants, and that includes The Association of Legal Aid Attorneys, Amalgamated Local Union 2325 of the UAW,

which I'll refer to as the union or the association, as well as eight individuals who are officers of that union.

Those are defendant Lisa Ohta, Mr. Bret Taylor, Jeremy Bunyaner, Emily Eaton, Martyna Kaznowski, Gillian Kress, Ioana Calin, and Puja Paul. And my deep apology to anyone for mispronouncing your name. Feel free to correct me.

The plaintiffs in this action bring two claims. The first is a claim to enforce the federal duty of fair representation, which is owed by labor unions to their members. This arises out of Section 9 of the National Labor Relations Act.

And the second claim is brought for breach of contract under New York Law.

Before we begin, I have a few preliminary issues to cover.

The first is that I want to underscore for all the importance of the fact that we're here today in a court of law and that the Court's role is to make a decision compelled by the law as applied to the facts in the record.

I ask that the only people who speak today are those at counsel table with the Court.

And while there are issues of tremendous importance to people in the room, issues that may be emotional and deeply sensitive, I ask that we all treat each other with

4

respect, and that folks in the gallery please remain quiet so I can really focus on getting the information I need from the counsel who are arguing on behalf of the parties. So I thank you all for that.

I'd like the parties to let me know which counsel will be answering my questions today.

So, for the plaintiffs, Ms. Raisner, will you be the principal counsel speaking?

MS. RAISNER: That's right, Your Honor.

THE COURT: Okay. Thank you.

And then for defendants, who will be speaking?

MR. FELSTINER: Mr. Felstiner.

THE COURT: Okay.

MR. FELSTINER: It will be me, Your Honor.

THE COURT: Thank you very much.

I was notified, in the several days leading to today's proceeding, that an attorney called my chambers several times, and on one occasion asked for legal advice.

So I just want to underscore that, as per my individual rules, calls to chambers are prohibited unless there are very, very urgent situations that are outlined in my rules. And that asking for legal advice from my staff is also not permitted. I ask counsel to just refresh their memories, take a look at the rules, and please respect those directives.

And then finally, as a reminder, I just want everyone to be aware that video and audio recording of this hearing is strictly prohibited under the local rules of the Eastern District of New York. That's Local Rule 1.8. And if you're seen recording the proceeding, a court security officer will escort you out of the courtroom.

I also ask now that everyone silence their phones. Thank you very much.

Okay. So turning to the issues before me, I will recount some of the procedural history of this case just so that everybody is on the same page.

This action was filed initially in the Supreme Court of Nassau County on November 16th with the plaintiffs' filing of a verified complaint and an order to show cause requesting the state court to immediately issue a temporary restraining order.

That TRO sought to restrict the defendants from circulating or voting upon a document entitled, quote, "Resolution Calling for a Cease Fire in Gaza, an End to the Israeli Occupation of Palestine and Support for Workers' Political Speech."

On November 17th, the state court issued a TRO that restrains and enjoins the union and the individual defendants who are officers of the union from doing three things.

The first is distributing the resolution for a vote

by the union membership.

The second is putting that resolution to a vote by the union membership.

And the third is otherwise causing the resolution to be distributed or disseminated to the membership.

The state court received briefing from both parties following the issuance of the November 17th TRO, and on November 21st heard argument on whether to continue the TRO.

At the end of that hearing, the state court indicated that it was continuing the TRO until it could make a decision, and that it was setting a control date of 35 days, and that it expected to make a decision in 30 days.

On December 1st, the defendants removed this case to this court. And on December 6th, the defendants filed a motion to dissolve the state court TRO.

I had a call with the parties to schedule briefing on this motion on Friday, December 8th.

I asked for plaintiffs' brief to be filed by Monday, December 11th. The plaintiffs indicated they needed more time, so I granted them some extra time permitting them to submit that brief on December 12th.

And as a result, I did not permit the defendants the opportunity to file a reply brief prior to having this hearing.

And based on that timeline, I initially scheduled

today's hearing for Wednesday, December 13th.

After setting those deadlines, plaintiffs wrote a letter asking the Court for an extension of time and an adjournment of the hearing to December 14th or 15th.

I granted that request permitting their brief and submissions to be filed on December 13th and moving the hearing to today, December 15th.

So before coming here to hear from counsel for both parties, I reviewed the defendants' motion to dissolve the TRO and its supporting papers as well as the plaintiffs' submission.  And later today, I'll kind of go through and make sure everyone is aware of exactly what I reviewed.

I did notice that in plaintiffs' response submission which included a legal brief, as well as additional evidentiary material to which the defendants have not yet had the chance to respond I writing, the plaintiffs requested that this court issue an injunction, a preliminary injunction.

And yesterday I did receive a submission from the plaintiffs that included a *New York Times* article which the defendants have also not had the chance to respond to in writing given the schedule that I just laid out.

So at the parties' requests, I also entered a schedule in the case for litigation on defendants' motion to dismiss and the plaintiffs' anticipated motion to remand, and

those will be briefed and fully submitted by January 31st, 2024.

So having kind of gone through that procedural history, I first want to address the question of whether this court has jurisdiction over the case because it was a case removed from state court to federal court.

I raised the issue of subject matter jurisdiction when I first talked to counsel in the case on December 8th. I've reviewed all of the briefing in the case.

I don't see that plaintiffs have raised a concern with subject matter jurisdiction. But, nevertheless, I have a responsibility to make sure that I make clear that the Court does, indeed, have jurisdiction over this case.

I've reviewed the notice of removal and find that the Court has federal question jurisdiction, pursuant to 18 U.S.C. 1331, over plaintiffs' claim of breach of the federal duty of fair representation. Under federal law, that duty of fair representation is a statutory obligation arising under the Nation Labor Relations Act. This is 29 U.S.C., Section 159(a).

And in *Breininger vs. Sheet Metal Workers International Association, Local Union No. 6*, the Supreme Court held that federal jurisdiction exists over fair representation claims because that duty is implied from the grant of exclusive representation status and the claims,

therefore, arise out of the NLRA.  And the citation for that holding is 493 U.S. 6783 (1989).

So in determining that plaintiffs' duty for fair representation claim raises a federal question, I also rely on the Supreme Court's decision in *Ford Motor Company vs. Huffman*.  That's 345 U.S. 330, at page 337, (1953).  And the Second Circuit's decision in *Green vs. Department of Education of New York City*.  That's 16 F.4th 1070, at page 1075, Second Circuit (2021).

Because the plaintiffs' remaining breach of contract claim under New York Common Law is part of the same case or controversy, and arises out of the same common nucleus of operative facts, the Court has supplemental jurisdiction over the breach of contract state law claim, pursuant to 28 U.S.C. 1367(a).

So that takes care of subject matter jurisdiction.

I'll turn now to personal jurisdiction.

And, again, I have not seen defendants, sorry, the plaintiffs raise a concern with personal jurisdiction, but I'm required to just make sure that it exists in the case.

I find that the Court does have personal jurisdiction over all the parties because they each have minimum contacts with the State of New York.

In making this determination, I rely on the Second Circuit's decision in *Licci ex rel. Licci vs. Lebanese*

10

*Canadian Bank SAL*.  That's 732 F.3d 161, at page 170, Second Circuit (2013).

Defendants' notice of removal states that the union's main office is located in Manhattan, New York, and that all of the individual defendants are officers of the union.

And according to paragraph 1 of the verified complaint, plaintiffs are attorneys employed by the Legal Aid Society of Nassau County, which defendants note is located in Hempstead, and Nassau County, New York.  That is from paragraph 1 of the notice of removal.

So based on these authorities, the minimum contacts necessary for this court to exercise personal jurisdiction exists in this case.

And I now turn to venue.

Venue is proper in this court under 28 U.S.C., Section 1441(a) and 18 U.S.C., Section 1446(a), because this action was originally filed in a state court located within the U.S. District Court for the Eastern District of New York.

Fourth, I also find that this action was properly removed from state court under 28 U.S.C., Section 1441 and 28 U.S.C., Section 1446.

The defendants signed a notice of removal, and that notice states the grounds for removal.  It is accompanied by the pleadings that plaintiffs served on defendants in the

state court action.  This is at entry No. 1 and 1-1 and 1-2 on the electronic court docket.

The notice of removal was timely filed within 30 days of service of the November 16, 2023 summons and verified complaint on the defendants.  All of the defendants have consented to removal.  And the record shows that defendants served three of the plaintiffs with the notice of removal.

On docket Nos. 8, 28, and 30, I see that plaintiffs, Diane Clarke, Llana Kopmar, and David Rosenfeld have been served.  I see on the docket at No. -- the filing at No. 27 that defendants filed an affidavit of due diligence showing that although service has not yet been affected on plaintiff Isaac Altman, defendants have exercised diligence in attempting to affect service.

Defendants also notified the state court by filing the notice of removal on the state court docket and filing with this court proof of the service of the notice of removal on the clerk of the Nassau County Supreme Court.

So I looked at the filing at docket entry No. 31 on the electronic docket for this case, as well as docket entries 32 and 33, the filing for the state court case, which is named *Clarke vs. The Association of Legal Aid Attorneys*, 618764-2023.

Counsel, so now, I'm going to turn it to you to let me know is there -- are there any issues with subject matter

12

jurisdiction, personal jurisdiction, venue, service, that you'd like to raise or discuss before we move on to other issues?

MS. RAISNER:  Not from the plaintiffs, Your Honor.

THE COURT:  Thank you.

MR. FELSTINER:  Not from the defendants, Your Honor.

THE COURT:  Okay.  Thank you very much.

So we can turn now to the motion that's the subject of today's proceeding, and this is docket No. 6, the defendants' motion to dissolve the TRO issued by the state court.

I want to be clear about what is the TRO that we are talking about.

That TRO was issued through the state court's oral order on November 21st of this year.  The state court noted on the record that it was continuing that TRO until it could make a decision.  I noted this earlier.  It set a control date of 35 days.  And it stated that it expected to make a decision in 30 days.

So as I read the record, I see that the TRO was to last at most 35 days, which was the control date set by the Court, from November 21st until the state court made a further decision which it anticipated would have been made within about 30 days.

13

On the tenth day that the TRO was in effect, December 1st, the defendants removed the case to this court, and I issued an order on December 12th stating my finding that the TRO will dissolve and cease to be in place by the end of today.

In making that determination, I reviewed Rule 65(b) of the Federal Rules of Civil Procedure and the Supreme Court's decision in *Granny Goose Foods, Incorporated*.  This is at 415 U.S. 423, page 437, and footnote 15, a 1974 decision, among other legal authorities that I identified in my order.

Counsel, are there any questions concerning my ruling on the duration of the TRO?

MS. RAISNER:  No, Your Honor.

MR. FELSTINER:  No, Your Honor.

THE COURT:  Okay.  Thank you.

So I'll turn now just to procedurally address the plaintiffs' request for a preliminary injunction which was made in their opposition filing on December 13th.

I'm not going to rule on a preliminary injunction today and I'm going to explain why.  There are three reasons.

First, when I set the briefing schedule in this case on December 8th in consultation with counsel for both parties, the only motion we were discussing was defendants' motion to dissolve the TRO.

On the call, I raised the question of the parties' positions on whether the order at issue is a TRO or a preliminary injunction and the parties agreed that it was a TRO.

But to further clarify, in light of the parties' dispute about whether that TRO was indefinite or for a limited duration, I issued the December 12th order. But I set this schedule in order to resolve a motion for a temporary restraining order.

So that motion, and this is my second point, is the only motion that is properly before the Court today under the rules of federal procedure for civil actions.

The third reason is that Rule 65 of the Federal Rules of Civil Procedure requires that the Court ensure that a party that would be enjoined by a preliminary injunction have notice and an opportunity to be heard before a preliminary injunction is issued.

The default rule, under Rule 6(c) of the Federal Rules of Civil Procedure, is that the opposing party is given at least 14 days' notice prior to a preliminary injunction hearing.

But as I noted, the plaintiffs' December 13th brief opposing the motion to dissolve is accompanied by new factual material to which the defendants have not had the opportunity to respond.

15

And as I also noticed, there is an additional New York Times article that was provided by the plaintiffs yesterday to which the defendants also have not had the chance to respond.

So for all of these reasons, today is not a preliminary injunction hearing.

At the conclusion of our hearing today, I'll be happy to discuss with the parties a proposal for briefing and a hearing on a preliminary injunction, and whether it makes sense to combine the preliminary injunction with a trial on the merits as is permissible in certain circumstances under the Federal Rules of Civil Procedure, but I want to clear up those expectations from the beginning because this is a question of civil procedure.

I'm happy to hear from counsel on this point.

Plaintiffs' counsel?

MR. HOSCHANDER:  Will Your Honor entertain the entry of a TRO today?

THE COURT:  So I don't have a motion for a TRO in front of me.  And, you know, the notice of removal in this case was filed on December 1.

I am going to hear about the motion to dissolve and reach a decision on that motion, but I don't see a motion to continue a TRO.

And you'll see in my December 12th order that I

16

cite authority from the Supreme Court and the Second Circuit that makes clear that in federal courts successive TROs are disfavored.

The purpose of a TRO is to freeze the action until there's briefing and a hearing on a preliminary injunction motion, but I don't have a preliminary injunction motion in front of me.

What I have is an opposition to defendants' motion to dissolve a TRO which requests that the Court issue a preliminary injunction, and that request was received less than two days ago.

MR. HOSCHANDER:  Will Your Honor allow us to consult with our clients for a moment?

THE COURT:  Sure.  Before you do that, I will hear from the defendants if they have any questions on my findings in the December 12th order.

MR. FELSTINER:  No questions, Your Honor.

THE COURT:  Okay.  Please go ahead.  We can take a five-minute recess.

(Pause)

MR. HOSCHANDER:  Thank you, Your Honor.  We appreciate it.

THE COURT:  Okay.  Sure.  Any further need for a pause?

MS. RAISNER:  No.

17

THE COURT:  Okay.  So I think with that understanding that I have before me a motion to dissolve the TRO, I am ready to question the parties about some issues that I do think are weighty, and I will start with the defendants since this is their motion.

So looking -- Mr. Felstiner, feel free to stay seated.  Whatever you're more comfortable with, whatever is fine for you.

Looking at the plain text of the TRO, and this is set forth in the November 17th order to show cause that Judge Muraca signed, do you agree that the TRO order enjoins defendants from doing three things?

That it enjoins distributing the resolution for a vote by the union membership; that it enjoins the defendants from putting the resolution to a vote by the union membership; and then otherwise causes the resolution to be -- prohibits the resolution from being distributed or disseminated to the membership.

Is that your reading, that those are three different things?

MR. FELSTINER:  Yes, Your Honor.

THE COURT:  Okay.

MR. FELSTINER:  Yes, Your Honor.

THE COURT:  Is there any distinction, for First Amendment purposes, between the restraint on the union and

18

the individual defendants' ability to disseminate the proposed resolution to the members and the restraint preventing them from putting the resolution to a vote?

MR. FELSTINER:  There are distinctions between those actions, but they are all protected as either speech association for the purpose of speech, or antecedent acts that are necessary in order to engage in speech.

THE COURT:  Okay.

MR. FELSTINER:  So for First Amendment purposes, no distinction, Your Honor.

THE COURT:  And what's your best authority on that issue?

MR. FELSTINER:  If you'll give me just one moment, I want to make sure I can give you the cite.  Pardon me.

THE COURT:  Take your time.

MR. FELSTINER:  Yes.  So on dissemination, that is what I would consider to be pure speech in the sense that dissemination of a document throughout the membership is an act of speech.  I don't know that I have a cite that delivering or disseminating a resolution is protected by the First Amendment.

On the slightly more I guess complicated interpretations, the right to engage in free association for the purpose of engaging in speech was guaranteed in *Roberts vs. U.S. Jaycees*, which is 468 U.S. 609 in 1984.  And the

19

relevant quote here is "that the Court has recognized a right to associate for the purpose of engaging in activities protected by the First Amendment, which includes speech and assembly, as well as petition, and free exercise of religion."

In terms of antecedent acts, there are a number of cases that deal with this.  I think perhaps one of the most on point is a relatively recent case in the Seventh Circuit called *ACLU vs. Alvarez*.  The citation 679 F.3d 589.  And that case, which involved recording of police officers, holds that antecedent acts that make speech possible are also protected by First Amendment.  So although that case concerns recording, in this case the antecedent acts would be assembling so that you can speak or rather defend a union and its members can speak as a group.  In order to be able to speak as a group, they need to first vote.

THE COURT:  Thank you.

And was there any change in the terms of the TRO when it was continued on November 21st as compared to when it was initially issued on November 17th?

MR. FELSTINER:  No, Your Honor.

THE COURT:  Okay.

MR. FELSTINER:  That, I believe, is made clear in the transcript.

THE COURT:  Okay.  And since you represent the

union, what is the union's position on whether any dues-paying member of the union is permitted to leave the union?

MR. FELSTINER:  A union is a voluntary organization.  Any member has the right to join or to resign membership.

THE COURT:  So why do people join the union?  What do they get out of it?

MR. FELSTINER:  Well, every member within the bargaining unit receives representation from the union as the exclusive bargaining representative of every employee in the unit.

People who are union members also receive membership rights under the union's constitution, which include a variety of things, participation in union activities.

But in terms of the representation, there's no difference between being a member or being a non-member.

THE COURT:  So the union will advocate for people, whether people's wages, their terms and conditions of employment, whether they are members of the union or not?  But they're --

MR. FELSTINER:  Not only will they, but they're statutorily required to advocate.  That is to say, give full and fair representation to any union member, excuse me, any member of the bargaining unit in the bargaining unit that the

21

union has been certified to represent.

THE COURT:  Okay.  And what is the bargaining unit that the union, thus the defendant, in this action been certified to represent?

MR. FELSTINER:  A number of units.  The union represents legal workers, attorneys, and other employees at over 20 institutions throughout this area and beyond.

THE COURT:  Okay.

MR. FELSTINER:  So they're different bargaining units.

THE COURT:  And what percentage of the employees of those 20 or so institutions that you referenced have elected to join the union, assuming that they're eligible for union membership?

MR. FELSTINER:  One moment, Your Honor.  I don't know the answer to that.

THE COURT:  Okay.

MR. FELSTINER:  I think I can represent that it is the overwhelming majority, but I don't know the exact figure.

THE COURT:  Okay.  Okay.  And is this union one that organizes employees for any government entities or are they employees for private, non-governmental entities?

MR. FELSTINER:  Only private, Your Honor.

THE COURT:  Okay.  So every single one of the employers, the entities employing the members of the union,

22

is a private entity and is not part of the -- they are not part of the government?

MR. FELSTINER:  That's correct, Your Honor.

THE COURT:  Okay.  And are you aware of any federal court decision in the country issuing an injunction to stop a union from conducting a vote on a resolution?

MR. FELSTINER:  I am not.  Pardon me.  I'm not aware of any decisions involving resolutions, no.  It is possible -- no, I'm not.  I'm not, Your Honor.

THE COURT:  Okay.

MR. FELSTINER:  I was quibbling for a second about whether certain union conduct would be -- could have been enjoined and could have been classified as a resolution in some sense, but I'm not aware of any decision enjoining a union from conducting a vote, a full vote of a membership on a resolution that's been placed before it.

THE COURT:  Okay.  You're not aware of a single decision by a federal court in the country issuing an order to stop a union from voting on a resolution that has been put before the full membership, is that correct?

MR. FELSTINER:  We are not.

THE COURT:  Okay.  Okay.  I'll turn to Ms. Raisner.

So I'll ask the same questions.

Looking at the plain text of the TRO, do you agree that that order enjoins defendants from doing the three

23

things I described?

MS. RAISNER:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

And do you see a distinction in the First Amendment jurisprudence for protection of any of those three different forms of conduct?

MS. RAISNER:  Your Honor, yes.  Because whether or not the speech that is attempting to be affected through the -- through this vote and through their resolution can be enjoined, right?

And the question, as to whether it is a prior restraint for this court to issue an injunction to prevent those three things you just described, ultimately goes to the merits, which is whether or not the underlying action is permissible, is the underlying speech permissible?

THE COURT:  So I saw that argument in your brief and I don't understand it, because I read the *Vans* case and that seems to be entirely distinguishable from this case here.  That concerned a trademark.  And what the Second Circuit I believe was saying in *Vans* was there the defense to the Lanham Act claim overlapped with the First Amendment claim, but I don't see that here in this case.

What's your argument?

MS. RAISNER:  The First Amendment issue that pervades this case is inherently intertwined with the

24

underlying allegations.  And if the underlying allegations are actionable, whether they relate to a union vote or something else, if that's a question that needs to be resolved on the merits and we can't decide, then as a matter of free speech it can't be enjoined.

THE COURT:  But this is the problem I'm having.  Is that when I look at the First Amendment jurisprudence, there's a real distinction between private actors and government actors.

So the union I just heard from defendants is a private, voluntary association and not the government.  So the First Amendment defense that the union is raising is against the Court.  The union is saying the Court is the government and it's restricting our ability to speak.

And there's no claim that the plaintiffs are bringing against the Court like that analogy just doesn't work.

MS. RAISNER:  Courts restrict speech all the time, right, then there is -- we have limitations on speech.  The right to free speech is not limited.

THE COURT:  That is true.  I agree with you.  The right to free speech is not limited.

MS. RAISNER:  And if the Court were to lift the TRO that's currently in place, thereby permitting the union to go forward with this vote and adopt the resolution, the Court

would, in fact, be facilitating compelled speech on behalf of all of the members of the union.

THE COURT:  So I want to tease apart this argument and really make sure I understand it because I'm concerned about a couple of things.

You raised the doctrine of compelled speech, and I see that you've cited *Evergreen*, the Second Circuit's decision in *Evergreen,* in your brief.  And I read that decision very closely.

In *Evergreen*, the Second Circuit was dealing with a New York City Law that was requiring certain entities, pregnancy centers, to make certain disclosures.  So there it was the government telling private entities they had to say things.

But here the union is a private entity.  It is not the government.

And the First Amendment concern that I didn't see addressed in your brief had to do with why I am not required to follow the Second Circuit's decision in *Metropolitan Opera*.  I'm really concerned about that because I simply didn't see an argument in your brief.

Because that decision held squarely that a state court TRO and a federal court preliminary injunction, which is what your clients are seeking, are government action that restricts speech and there are real First Amendment concerns.

26

That's what the Second Circuit held.

And *Metropolitan Opera* concerned speech by a union. It was a union that the defendant claimed was engaging in harassing speech of the Metropolitan Opera, their donors, their patrons, and the injunction of the federal court, as well as the TRO issued early in the action by the state court, entirely, you know, prohibited the union from engaging in threatening speech, harassing speech, things of that kind.

And when the case got up to the Second Circuit, the Second Circuit said that's government action restricting speech, that raises very serious concerns, particularly because a TRO or injunction of this nature can lead to contempt sanctions.  The entity subject to the TRO or injunction can be held in contempt of court.

So the First Amendment concerns are extremely weighty, and that's a direct authority here that I haven't seen the plaintiffs distinguish or explain to me why I can ignore that authority from the court that is directly above me.

MS. RAISNER:  You can ignore it because issuing or continuing the injunction, the temp, the TRO, or, you know, denying it, the defendants' motion to dissolve the TRO, does not actually restrict the speech of the union.  Nor does it actually restrict the speech of any individual defendants who are board members of that union.

And the reason for that is the TRO that was issued by the state court was, as you read it, very narrowly tailored to the resolution that the union is attempting to disseminate to its members to submit to a vote for formal adoption and to then speak on behalf of all the members.

It does not, for example, restrain the union from issuing its own statement independent of a vote by the members which is a formal action to speak on all their behalf.

It does not, for example, prohibit any of the individual board members who are defendants in this case from making exactly the same statements, sharing exactly the same sentiments, and distributing them to whomever they like.

It is narrow and it is -- it restricts a particular action that is barred by the union's contractual obligations and other obligations.

THE COURT:  Here is my concern with that argument.

What I hear you saying is that because the TRO doesn't restrict all speech of the union, it's restriction of this form of speech, the distribution and dissemination of the resolution at issue here, as well as the distribution of that resolution to put to a vote or otherwise putting it to a vote of the membership, that that is, therefore, not restrictive speech.

But that doesn't work under the Supreme Court or

Case 2:23-cv-08869-NJC-ARL   Document 38   Filed 12/26/23   Page 28 of 81 PageID #: 603

28

the Second Circuit's guidance. Just because not every form of speech is restricted doesn't mean that a restriction on a specific type of speech is restricted.

MS. RAISNER: It's not really about the form. It's about the fact it doesn't actually restrict them from speaking, right?

It's not a form of speech, the membership vote. It is a formal action by the union on behalf of its members. And the fact --

THE COURT: Well, I think the union is allowed to speak however it wants.

MS. RAISNER: That's right.

THE COURT: It's not for the federal court to say the only way you can speak is through certain types of statements or certain -- right?

Like is there authority telling me that I can go to a private association and privilege certain channels or types of communication over others? Because I haven't seen that authority in either parties' submissions.

MS. RAISNER: What the plaintiffs are asking the Court to do is to restrict an action that speaks on behalf of those other than the people taking that action. It's not, in fact, restricting defendants' own speech. It's not, in fact, restricting the union's speech at all.

It is restricting them from making a statement on

Fiore Reporting and Transcription Service, Inc.   203 929 9992

29

somebody else's behalf entirely.  That can't be seen as a restriction of their speech.  It's a restriction of their ability to, through a formal union procedure, speak on behalf of others who haven't made the statement.

THE COURT:  So are plaintiffs taking the position that the union can't speak through a resolution voted on by members on any topic whatsoever?

MS. RAISNER:  No.  Although --

THE COURT:  Okay.

MS. RAISNER:  Although the bar is high.

THE COURT:  Okay.  So now I'm confused.

You're saying that the union can't vote on this specific resolution through a vote of the full membership, but it could do full membership votes on other forms of speech?

MS. RAISNER:  Your Honor, I haven't gone through all of the variable topics and manners and subjects and voting outcomes and, you know, put them on the chart and said, yes, they can and, no, they can't.

What I can tell you is the fact that this would only be the second ever member resolution by this union on behalf of its members, when, in fact, it takes positions and speaks on issues all the time suggests that the defendants also are aware of the fact that they are, in fact, compelling others' speech and engaging in an improper action to speak on

others' behalf.

THE COURT:  But I don't think that that answers my question.

Because I read the Supreme Court's decision in the *Janus* case.  This is *Janus vs. American Federation of State, County and Municipal Employees Council*, 31138 Supreme Court 2448, and this is a 2018 decision.  And the specific passage I looked at was on page 2476.  And I'll read it to you.

The Supreme Court noted that unions can speak out on controversial subjects such as climate change, the confederacy, sexual orientation, and gender identity, evolution, and minority religions.  These are sensitive political topics and they're undoubtedly matters of profound value and concern to the public.

We have often recognized that speech occupies the highest rung of the hierarchy of First Amendment values and merits special protection.

So I don't see a case that you're pointing me to in the First Amendment context that says that a federal court can say a union can talk through its president, but not through a full membership vote.  I just don't see the authority there.

And the challenge I'm experiencing is that the TRO is restricting distribution and dissemination of this resolution to the membership, that is very broad.

It is also restricting distribution of this resolution for the purpose of a vote and then it's restricting putting this resolution for a vote.

I don't see in your submission legal authority that tells me a court can stop a union from holding a vote on a resolution. And I certainly don't see any authority in your briefs for the proposition that a federal court order or state court order can restrict a union from distributing or disseminating a resolution to its membership, that is extremely broad.

By contrast, I see the Second Circuit's decision in *Metropolitan Opera*, which states that a court order restricting the way a union speaks has tremendous First Amendment implications because these are private organizations, they are not the government.

MS. RAISNER: So I'll respond to the last point first, which is, the TRO.

Whether it's -- whether it were to stand exactly as it is now, or whether it were, for example, to be narrowed further to limit let's say the third prong, right -- and so we would not be seeking to enjoin the union from disseminating to its own members anything it wants, but only to restrict it from affecting through a vote the adoption of this resolution on behalf of the membership.

The response to *Janus* and to *Metropolitan Opera* is

that in doing so you would not be restricting the speech of the union. The nature of a member-adopted resolution in the context of this union and its bylaws is that it is a formal act to communicate on others' behalf in addition to itself as the union. It speaks on behalf of the full membership.

And if you look at the resolution, it states so in a number of places. It purports to speak on behalf of all of the legal aide attorneys who are within the representation of that union.

And then it is -- it introduces a number of factual, and then advocacy resolutions, many of which start with we the members, the attorneys, we, the attorneys. It is not the union's speech. It's a falsehood.

It's being put out on behalf of people who did not say it and who do not agree with it. It's not the union's speech.

The union can issue its own statement as it has in 99 percent of the times it has wished to speak on a subject of any nature in the form of a statement on behalf of the union.

THE COURT: What is your strongest legal authority that a court order restraining a union from taking a vote on a resolution is not government action subject to the First Amendment? What's your best case?

MS. RAISNER: Your Honor, if you'd give me 30

33

seconds --

THE COURT:  Sure.

MS. RAISNER:  -- so I can actually give you --

THE COURT:  Take your time.

MS. RAISNER:  -- an answer to that.

THE COURT:  Mm-hmm.

MS. RAISNER:  Your Honor, the *Pacific Gas & Electric Company* case from 1986, that I believe the defendants cited, but we cited in our brief as well, states that there is necessarily a concomitant freedom not to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect.

THE COURT:  Okay.  Can you tell me what speech was at issue there?  Who was compelling the speech?

MS. RAISNER:  I believe it was a government actor.

THE COURT:  Exactly.  It was an agency of the --

MS. RAISNER:  Yes.

THE COURT:  -- California government that was I believe including certain disclosures in mailings sent by a private entity.

So this is the challenge that I'm having here is I'm looking for the case that plaintiffs are pointing me to to say I can disregard the Second Circuit precedent in *Metropolitan Opera*.

MS. RAISNER:  And the reason you can distinguish

34

it, however, is on the facts. You don't need a case to do that. You can distinguish it on the facts, which is here the union is not attempting to speak for the union and, therefore, it's not on all fours with that case.

I'd also note that the absence of a precedent that speaks to this question is likely the function of the fact that unions typically do not attempt to communicate in this way on behalf of their members in the form of a resolution. This union has not either.

And we've put before the Court a digest of instances, or in modern history, in which this union has attempted and has succeeded in speaking out on all kinds of issues on behalf of the union.

THE COURT: Can you remind me, is that Exhibit A to one of the declarations that you submitted?

MS. RAISNER: Yes. It is an exhibit to the declaration of Diane Clarke.

THE COURT: Okay. Thank you so much.

So when I look at this exhibit, I see numerous controversial political issues that certainly during the time when these statements were issued were highly divisive --

MS. RAISNER: That's right.

THE COURT: -- engendered many different feelings on many different sides, but show a history of the defendant union in this case engaging in speech of that nature.

35

MS. RAISNER:  The union, in statements and positions, almost none of which purport to speak on behalf of the members --

THE COURT:  Mm-hmm.

MS. RAISNER:  -- through a member-adopted resolution.  There has only ever been one.

And I suggest to you, Your Honor, that the reason we don't see cases addressing this factual circumstance is because it is a rare exception and the union often speaks in other ways.

THE COURT:  Mm-hmm.  I did look at closely the bylaws of the union and the UAW Constitution, which was very lengthy, to see if there was a place where it said that the union here is not permitted to put a resolution to a vote by the membership.  I didn't find that.  And I don't believe anyone pointed me to a place where that exists.  But if there is somewhere, please let me know.

MS. RAISNER:  So what we would point you to, Your Honor, is the part of the bylaws that state what the union can do, what the membership can do, and there's not an unlimited scope.

THE COURT:  Okay.  Let me pull this up.  I have bylaws in an exhibit to I think one of the defendants' declarations.

MS. RAISNER:  That's right.

36

THE COURT: And I read in your brief that you focus on Article 3, certain of the principles and purposes, is that what you're looking at? Or is it a different part of the bylaws?

MS. RAISNER: It is Articles 3 and Articles 4.1.

THE COURT: Okay. Why don't you walk me through your argument on this point.

MS. RAISNER: So if you --

THE COURT: Because I did read this, and I didn't see here anything stating that the union could not decide to put a resolution to a vote by the full membership.

MS. RAISNER: Well, for starters, it doesn't say that the union can.

What it does say in Article 4, Subsection 1, when it talks about the membership and the membership's authority, the membership is the highest authority within the union. It has authority to determine critical issues such as ratify contracts, strike, return to work, set dues, and elect officers and delegates, including delegates to the UAW Constitutional Conventions. That is a specific list, enumerated list, of what is within the membership's scope of its authority.

THE COURT: So I thought this sentence was interesting because both parties talk about Article 4, Section 1, and the interpretation of this sentence, that the

membership has authority to determine critical issues, such as, and then there's a list that you read out, ratifying contracts, strike, return to work, set dues, and elect officers and delegates, including delegates to UAW Constitutional Conventions.

I see that the plaintiffs want the Court to read that list as an exclusive list, and the defendants are arguing that it's an illustrative list, that there are other things that could be critical issues here.

Why should I read this the way that the plaintiffs are reading it when such as is an introduction to examples rather than exclusive, limited, universe of areas of concern?

MS. RAISNER:  If the bylaws were intended to give the membership unlimited authority to determine critical issues and stop there and did not include examples in a particular category, I would agree that it would be hard to argue that they restrict the membership vote that the union is trying to affect.

However, the inclusion of the second clause, such as, ratify contracts, strike, return to work, I agree with you and with defendants that that is not necessarily an exhaustive list.

However, the words such as are there for a reason and they're there to introduce us to a scope or a category if you will of the types of things that the membership has

38

within its authority to determine as critical issues.
Contracts, strikes, return to work, set dues and elect
officers.

Issuing a membership resolution through a vote
about something that has nothing to do with the union's
duties to its members, collective bargaining, advocating for
workplace rights, strikes, return to work, is very far from
that list, and that list is not there for no reason.

THE COURT:  Okay.  Thank you for addressing that
point.

I think on that point I'll hand it over to
defendants to see if they want to make any arguments on that
issue.

MR. FELSTINER:  Thank you, Your Honor.  Two things.

First, as Your Honor pointed out, it is not an
exclusive list.

And, as Your Honor also pointed out, the bylaws
contain no prohibition on the union presenting this issue or
this resolution to a full vote of the membership.

But there's an even more important point here that
we did not have an opportunity to address in our initial
motion papers.

But now hearing plaintiffs' request that the Court
read and interpret the union's constitution, we must bring
the Court's attention to the issue of deference, which is not

addressed anywhere in plaintiffs' memorandum of opposition.

The plaintiffs are asking the Court to read and interpret the union's bylaws and second guess the actions that the defendants took.  But in cases involving breach of a union constitution, courts will defer to the union's interpretation of its own constitution unless that interpretation is patently unreasonable.

THE COURT:  Could you say that again --

MR. FELSTINER:  Certainly.

THE COURT:  -- because I don't think I fully understood that.

MR. FELSTINER:  Certainly.  When a member -- I'll try to -- I'll say it again.

When a member alleges a breach of the union's constitution, and a court is called upon to interpret the terms of that constitution, in other words, whereas here there's no explicit provision permitting or prohibiting this particular resolution from going to a vote, but instead the Court is asked to do a piece of contract interpretation, a classic piece, as plaintiffs have just asked you to do, read a non-exhaustive list and determine what the intent of the parties was, in those situations, the Court does not engage in a standard contract analysis.

The Court owes and gives deference to the union's interpretation of its own governing document unless that

interpretation is patently unreasonable.

THE COURT:  And what authority provides that guidance?

MR. FELSTINER:  Certainly.

The case, leading case on this Second Circuit case, is called *Sim vs. New York Mailers' Union*.  The cite is 166 F.3d 465.  It is a Second Circuit case from 1999.  And the quote that I have here is "the interpretation of bylaw provisions by union officials will be upheld unless patently unreasonable."

So unless the defendants' actions here were patently unreasonable, the Court owes deference to the union's interpretation of its own governing documents, and may not engage in the kind of probing, contractual analysis that plaintiffs have invited here.  And defendants would submit that here the actions were not parentally unreasonable.

As I already noted, the bylaws do not prohibit members from voting on this resolution or the officers from placing the resolution before the full membership.  The reasons were rational.

It was placed before the membership in good faith and it was placed before the membership on approval of the elected leadership of the joint council, which is a governing body that has, after the membership, the highest authority in

the union.  In fact, its authority is higher than the officers.

THE COURT:  I have a question.

Where is the kind of mechanism for assessing proposals for a full membership vote laid out?

MR. FELSTINER:  There's no mechanism in the bylaws. But the bylaws do charge the officers with carrying out the decisions of the joint council.

So, in this case, the joint council voted to send this resolution to a vote of the full membership.  And, under the bylaws, the officers were charged with carrying that out. So not only was it reasonable to schedule this resolution for a vote, it was arguably required.

THE COURT:  Okay.  I'll turn over to Ms. Raisner.

Is there anything else that you'd like to argue or to share, as I think through the issues here, which I do think are weighty and important ones?

MS. RAISNER:  If the union is entitled to a governmental standard of deference, then why is not held to a governmental standard when we're talking about free speech?

THE COURT:  Anything further on any part of your papers that you'd like to address?

MS. RAISNER:  I think that's it.

THE COURT:  Okay.  Thank you.

For the defendants, anything further that counsel

42

wishes to address?

MR. FELSTINER:  Only just to point out that there are independent grounds that mandate dissolution of this TRO, apart from the First Amendment issues, and that is the absence of a showing on the equitable requirements that are necessary for the plaintiffs to obtain injunctive relief. That is to say, likelihood of success on the merits of their underlying claims, irreparable harm, and the balance of the equities and public interest tipping in their favor.

And we -- I can refer the Court to our briefs on this, but I just wanted to point that independent of any constitutional issues, there are fatal flaws in the underlying claims that preclude the Court from granting this relief.

THE COURT:  Okay.

MS. RAISNER:  Your Honor, if I may one, one further point?

THE COURT:  Yes.  Absolutely.  Please.  Go ahead.

MS. RAISNER:  Another distinction that we urge the Court to consider between the cases that speak to free speech and the fact here is that actually, although the union technically is a private institution, it is a union that is unlike others because its members are legal aid attorneys who are bound by constitutionally mandated obligations under *Gideon vs. Wainwright.*

THE COURT:  Is there anything further you'd like to say about that distinction?  Like why the free speech rights of a union would be different if the lawyers are members of that union?

MS. RAISNER:  Because the action that is contemplated being taken is being -- is contemplated to be taken on behalf of the members who are providing constitutionally-mandated services to their clients under *Gideon vs. Wainwright*.  And in that way, the union here cannot be said to be acting like any other private institution.

MR. FELSTINER:  Your Honor --

THE COURT:  It --

MR. FELSTINER:  Oops.  I'm sorry.

THE COURT:  No.  Go ahead.

MR. FELSTINER:  I wanted to ask permission to respond.

The defendant union and its members have no lower rights to free expression than any other individuals or union members.  It does not matter that they carry out this important duty under the constitution.  There are many employees that carry out either government-mandated duties or other duties that have some value to the public interest and that doesn't in any way restrict their right to speak.

Also that does not in any way reduce the

plaintiffs' burden to show that they have a likelihood of success and irreparable harm on their claims.

THE COURT:  Okay.  Okay.

MS. RAISNER:  A final, if I may?

THE COURT:  Absolutely.

MS. RAISNER:  One last --

THE COURT:  Please go ahead.

MS. RAISNER:  Thank you, Your Honor.

THE COURT:  Mm-hmm.

MS. RAISNER:  The union affecting this resolution in the name of its members, who are providing constitutionally-mandated services, the membership does not have the right to compel the speech of other members who do not agree.

THE COURT:  Mm-hmm.  Just a couple of clarifying points, Ms. Raisner.

The union, I understand, is around 2700 people, but not all of the members are lawyers, is that right?

MS. RAISNER:  That's right.

THE COURT:  Okay.  And do you agree with your adversary that individuals may voluntarily leave the union?  Do you agree with that point?  Is that disputed?

MS. RAISNER:  No.

THE COURT:  Okay.  And do you dispute that the union is a private entity that is not part of the U.S.

45

Government or a state government or county government?

MS. RAISNER:  If they're entitled to governmental standard of deference, then I do dispute that they're an entirely private actor.

THE COURT:  Okay.  Okay.  Understood.

MS. RAISNER:  And, again, they're distinct from other non-governmental institutions and entities because an act by its membership, who are charged with constitutionally-mandated responsibilities, makes this different from another private company or organization.

THE COURT:  Okay.

MS. RAISNER:  And, therefore, the membership cannot compel the speech of other members through this resolution.

THE COURT:  Anything further that either party would wish to share with me as I think through these issues?

Ms. Raisner?

MS. RAISNER:  That's it.

THE COURT:  Okay.  Thank you.

Defendants?

MR. FELSTINER:  No, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you so much.

I'm going to take a brief recess and we will reconvene in about five, maybe ten minutes.

MS. RAISNER:  Thank you, Your Honor.

THE COURT:  Thank you very much.

46

(Recess taken 2:09 p.m. to 2:25 p.m.)

THE COURT:  Okay.  Thanks everyone for taking a pause while I considered the arguments by both parties today.

As I mentioned at the beginning of this proceeding, the case and the motion at issue raise really important issues that I've thought deeply about.

I have heard argument from both parties.  Thank you for your advocacy.  It was very well done.

I also reviewed both parties' submissions, and I will go through what I reviewed.

I have reviewed the defendants' notice of removal, including all exhibits, which include the resolution at issue in this case, their legal brief, the declaration of defendant Lisa Ohta with six attached exhibits.  Those exhibits are the UAW Constitution, the bylaws of the union at issue, the union that's a defendant in this case, an email notice regarding a joint council meeting of that union, an attachment to an email noting the joint council meeting that was part of the events giving rise to this litigation, the state court summons and verified complaint filed by the plaintiffs, and the state court TRO which is a November 17th written order to show cause which was continued by oral order of the Court on November 21st.

I also reviewed from the plaintiffs their legal memorandum, an affidavit by plaintiff Diane Clarke with an

attached exhibit, which we went over, compiling statements previously made by the union, a declaration of Attorney Daniel Khan with six attached exhibits.  Which include a reply affirmation that was submitted by Attorney David Smith in the state court proceedings on behalf of plaintiffs seeking a TRO, as well as a press release, the Legal Aid Society Handbook, a statement issued by the Legal Aid Society of Nassau County opposing the resolution at issue here, a social media screenshot, and some documents concerning communication between union members regarding the resolution and the TRO that's the subject of the defendants' motion.

All of these documents are filed on the docket, ECF No. 1, ECF No. 7, ECF No. 6, with assorted exhibits, ECF No. 24, ECF No. 25, and assorted exhibits as well.

I also reviewed those additional submissions from the plaintiffs including a transcript from the November 21st, 2023 hearing held in the Nassau County Supreme Court which is filed on the docket as ECF No. 33.  A declaration from one of plaintiff's counsel attaching a New York Times article concerning developments at the Bronx Defenders, that's ECF No. 29.

So in determining whether to dissolve a TRO, I consider the factors that must support any TRO that is issued in a federal court.  The Second Circuit has made clear that a TRO must be supported by a showing of three things.

48

The first is irreparable harm if the TRO is not issued.

Second, either a likelihood of success on the merits of the claims at issue, or both serious questions on the merits and balance of hardships decidedly favoring the moving party seeking the TRO.

And then third, that the TRO is in the public interest.

These factors are well-established and are set forth in the Second Circuit's decision in *North American Soccer League, LLC vs. U.S. Soccer Federation*, 883 F.3d 32, at page 37.  This is a 2018 case.

So I conducted this analysis.  And in doing so, I first noted my concern that neither the state court's initial grant of a TRO on November 17th nor its continuation of the TRO on November 21st was supported by any of these findings.

The state court did not make findings about irreparable harm, likelihood of success on the merits, a serious question on the merits, a balance of hardships, or the public interest.

Without making those findings, the TRO restrains and enjoins both the union and the eight individual defendants from doing three things.

It prohibits them from distributing the resolution for a vote by the union membership.

It prohibits them from putting the resolution to a vote by the union membership.

And it very broadly prohibits them from otherwise causing the resolution to be distributed or disseminated to the said membership.

That third component is broad.  It is broader than the previous two components.

My second concern is that the TRO raises weighty First Amendment concerns.

The union is a private, voluntary, unincorporated association that has a right to free speech under the precedents of the United States Supreme Court and the U.S. Court of Appeals for the Second Circuit.

The Supreme Court recognized in *Pacific Gas & Electric Company* that associations, this is a quote, "like individuals, contribute to the discussion, debate and dissemination of information and ideas that the First Amendment seeks to foster."  This is at 475 U.S. 1, page 8 (1986).

In *Pacific Gas*, the Supreme Court invalidated a government order that a private utility placed a third-party newsletter in its billing envelopes.  It held that this was impermissible content-based discrimination and was not narrowly tailored to promote a compelling government interest.  Nor was it justified by a state interest in

50

promoting speech to make a variety of views available to the ratepayers or the state's interest in fair and effective utility regulation.

Similarly, in *Consolidated Edison Corporation vs. Public Service Commission of New York*, the Supreme Court invalidated a state order prohibiting a privately-owned utility company from discussing controversial political issues in its billing envelopes.  This is at 447 U.S. 530, page 554, a 1980 decision.

And as I noted before, the Supreme Court in *Janus vs. American Federation of State, County and Municipal Employees Council*, stated the following in the context of public sector unions.

Unions can also speak out in collective bargaining on controversial subjects such as climate change, the confederacy, sexual orientation, and gender identity, evolution, and minority religions.  These are sensitive political topics.  They're undoubtedly matters of profound value and concern to the public.  We have often recognized that such speech occupies the highest wrung of the hierarchy of First Amendment values and merits special protection.  This is at 138 Supreme Court Reporter 2448-2476 (2018).

The TRO at issue in this case plainly targets the union's speech by preventing the union and its leadership from distributing the resolution to the full membership and

from putting the resolution to the full membership for a vote so that it may adopt the resolution as the union's speech.

The TRO directly implicates the Second Circuit's decision in *Metropolitan Opera Association vs. Local 100*. There the Second Circuit held that a TRO prohibiting a union and its members generally from, quote, "threatening or harassing" and, quote, "engaging in fraudulent or defamatory representations regarding the Met Opera and its donors, officers, patrons and directors targeted the union and its members' speech."  This is at 239 F.3d 172, pages 176 to 177, Second Circuit (2001).

That case was initially filed in state court.  And like this one was removed to federal court where the defendants moved to dissolve the TRO.

In *Metropolitan Opera*, the district court denied the motion to dissolve and continued the TRO as a preliminary injunction.

The Second Circuit found, however, that the preliminary injunction broadly prohibited the union from making any statement that might, after it had been made, be construed as defamatory or even harassing, and it noted that the injunction, quote, "presents serious questions under the First Amendment."

It also make clear that when, quote, "a prior restraint takes the form of a court-issued injunction, the

52

risk of infringing on speech protected under the First Amendment increases," close quote.  That is page 174 of the decision.

For that principle, the Second Circuit relied on a U.S. Supreme Court decision, *Madsen vs. Women's Health Center*, 512 U.S. 753, page 764, a 1994 decision, where the Supreme Court stated that injunctions carry greater risk of censorship and discriminatory application.  They undo general ordinances.

As the Second Circuit noted in *Metropolitan Opera*, an injunction must be obeyed until modified or dissolved, and its unconstitutionality is no defense to disobedience.

Plaintiffs have not identified a single case where a court issued a TRO or injunction preventing a private union from distributing or disseminating a document expressing controversial political views or from holding a vote on whether the union should adopt that document's political message.

Instead of providing a single case from any federal court nationwide, plaintiffs argue that the union's voting upon and passage of the resolution would infringe on their individual speech rights by compelling them to be associated with the message they find to be vile, abhorrent, discriminatory, anti-Israel, and antisemitic.

Those are deeply held views and is not the Court's

place at all to question those feelings.

But the plaintiffs haven't identified a case showing that there is government action triggering the protections of the First Amendment when the union, a private, voluntary, unincorporated association, engages in speech.

Plaintiffs cite to *Evergreen Association, Incorporated vs. City of New York*, but that case is distinguishable because it concerned government action in the form of a local law compelling pregnancy centers to make certain disclosures.  This is at 740 F.3d 233, Second Circuit (2014).

Unlike the New York City Law at issue in *Evergreen*, here a union's act of speaking or putting the resolution to a vote is not state action because the union is a private, voluntary organization.  As a result, the First Amendment doctrine of compelled speech does not apply.

Plaintiffs rely on a Second Circuit decision in *Jews for Jesus, Incorporated vs. Jewish Community Relations Council of New York, Incorporated*.  This is at 968 F.2d 286, Second Circuit (1992).

That case is also in opposite.  It concerned the constitutionality of anti-discrimination laws that may place an incidental limitation on expressive conduct.

Plaintiffs have not explained how in this case defendants have allegedly used, quote, "otherwise protected

54

speech or conduct to force or aid others to act in violation of a conduct-regulating statute," close quote, as with the case in *Jews for Jesus*.

Plaintiffs also rely on *Loekle vs. Hanson*, 551 F.Supp. 74, page 81, SDNY (1982), for the notion that there is no constitutional value in the resolution's statements because according to the plaintiff those statements are, quote, "false statements of fact."

*Loekle* cited the Supreme Court's decision in *Gertz vs. Welch*, 418 U.S. 323-340 (1974).  And *Loekle* is distinguishable because it didn't concern political speech of the kind at issue in this case.

There a union board convicted two members for deliberately misleading the union by writing a letter that requested an investigation into a purported missing mailbag, and by having that letter read at a membership meeting, all without mentioning that they had been told that a postal investigation had concluded that no mailbag had been taken.

Unlike this case, *Loekle* concerned a question as to whether the disciplinary hearings satisfied the fairness requirement of the Labor Management Reporting and Disclosure Act of 1959.

The defendants argue that the TRO is content-based and viewpoint-based restriction on speech because plaintiffs believe the resolution is antisemitic and that this

antisemitism will be automatically imputed to plaintiffs as members of the union.

Because the state court did not state the reasons for the TRO, it is not clear from the record whether the Court sought to target the defendants' dissemination of the resolution, and act of putting it to a vote, based on the viewpoint expressed or the subject matter of the speech.

But the record doesn't show that the TRO is narrowly tailored to promote a compelling government interest and that is the applicable test.

The only government interest identified by the plaintiffs is the government interest in ensuring representation by competent counsel for indigent people charged with crimes.

But under the precedence of the U.S. Supreme Court and the Second Circuit, the TRO is government action that plainly targets speech and must be narrowly tailored to further that government interest in ensuring representation by competent counsel for indigent defendants, but plaintiffs don't show that the TRO meets this high standard.

For all of these reasons, the TRO on its face must be dissolved.

The plaintiffs also do not show the immediate irreparable harm required to support a TRO.

Demonstrating irreparable harm is the single most

important prerequisite for the entrance of a temporary restraining order.  This is set forth in the Second Circuit's decision in *Faivley Transport Malmo AB vs. Wabtec Corp.*, 559 F.3d 110, page 118, 2009 decision.

To satisfy this requirement, plaintiffs must show that absent a TRO they will suffer an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm.

Plaintiffs argue that if the union membership vote to adopt the resolution it would harm their representation of their current and future clients by creating immediate, actual, and apparent conflicts of interest, that it would damage their professional and personal reputations, and that it would compel their speech.

And I will address each of those arguments in turn.

First, plaintiffs argue the resolution will create an apparent or actual conflict between them and their current and future clients which would jeopardize plaintiffs' obligations under *Gideon vs. Wainwright*.

According to the plaintiffs, if the union membership passes the resolution, the resolution is likely to infect the attorney-client relationship between the Jewish citizens of Nassau County and their Nassau County Legal Aid Society legal aid attorneys, including plaintiffs, with the

57

perception that these attorneys are biased against their religion and ethnicity.  And this is on page 10 of the plaintiffs' brief.

Defendants contend that the resolution would not create an actual or apparent conflict under the New York Rules of Professional Conduct because, under the objective test of Rule 1.7(a), a reasonable lawyer would not assume that membership in a bar association, for example, automatically implies endorsement of every statement that association makes on members of public concern.  This is on page 15 of the defendants' brief.

The plaintiffs haven't identified legal authority or rulings under New York Rules of Professional Conduct that contradict the defendants' argument on this point.

The plaintiffs argue that defendants failed to address what a reasonable client would presume about individual attorneys who are members of the union if the resolution is enacted, but they don't cite authority establishing that this is the proper standard.

Reviewing the applicable rules of professional conduct, the resolution, and the record as a whole, the Court finds that a reasonable lawyer would not conclude that any and every member of the union supports the resolution.

The record shows that numerous members of the union, including, but not limited to plaintiffs, disagree

strongly with the resolution.

The Court also finds that a reasonable lawyer would not conclude that an attorney's imputed support for the resolution by virtue of the union's vote on that resolution constitutes an interest the attorney would represent in the course of defending a client, such as a Jewish client, such that the attorney would be representing different interests within the meaning of Rule 1.7(a).

The Court finds that the plaintiffs have not shown that a full membership vote on the resolution or the union's adoption of the resolution would create an actual or apparent conflict of interest under Rule 1.7(a)(2).

The resolution is not a financial business or property interest, nor is it a personal interest of every union member. The record does not show that it is.

On this record, plaintiffs failed to show that defendants' dissemination or distribution of the resolution to the membership, or putting the resolution to a full membership vote, would impose actual and imminent harm to their representation of current and future indigent clients.

The second argument plaintiffs make on irreparable harm is that the resolution would irretrievably damage plaintiffs' personal and professional reputations.

Plaintiffs argue that the union membership's adoption of the resolution would immediately diminish their

59

reputations in the eyes of their opposing counsel, judges, and others in the legal community.

Plaintiffs cite non-controlling authority in support of their argument and the facts are different.

They rely on *Feinerman vs. Bernardi*, this is 558 F.Supp. 2nd 36, pages 50 to 51, District of D.C. (2008). That case is distinguishable because the plaintiffs there appealed an agency determination to debar them from future participation in transactions with the executive branch of the federal government.

The Court found irreparable harm as to one of three plaintiffs, because even though monetary loss is not generally irreparable harm, that plaintiffs couldn't recover from the defendant because of sovereign immunity, so his lost income was irreparable.

Here there is no analogous argument by the plaintiffs.

Plaintiffs also rely on *Stein vs. Lee Eye Center, Incorporated*, 2021 Westlaw 5770212 at page 3. This is a Western District of Pennsylvania case from December 6th, 2021.

There the Court found irreparable harm where the plaintiff stood to imminently lose his ownership interest in the ophthalmology practice he built over 25 years, as well as his reputation, patient goodwill, and standing in the

community.

And plaintiffs' here are not of similar magnitude.

Defendants argue that plaintiffs' argument centering on putative reputational harms is not cognizable because these harms rely on assumptions about the reactions of third parties and are, therefore, speculative.

Based on the record, the plaintiffs haven't identified specific opposing counsel or judges or other lawyers who would view them negatively if the union were to disseminate the resolution to the membership or if the membership were to vote on the resolution.

As noted earlier, plaintiffs can speak vociferously against the resolution.  They have shown they do not agree with the resolution through their speech and through the filing of this very lawsuit.

Plaintiffs have identified and responded that since the union proffered the resolution, plaintiffs and their Jewish colleagues have already been, quote, "castigated and humiliated by members of their own union."  This is on page 12 of plaintiffs' brief.

Specifically, three individual plaintiffs state in their reply affirmation to the state court that they were subjected to another union member who directed towards them the statement, quote, "from the river to the sea," quote.

These facts are repeated in plaintiffs' opposition

to defendants' motion.

Plaintiffs also argue that other opponents to the resolution have been pejoratively labeled, quote, "Zionists," and have been disavowed by union members who support the resolution.

The plaintiffs argue that these actions have had a real and serious emotional toll on them.

The Court hears that concern. The Court acknowledges that emotional toll and the harm that plaintiffs have experienced as a result of those incidents.

The showing of irreparable harm to secure a TRO is, however, a high standard.

On this record, the Court does not find that the specific instances identified by the plaintiffs or the potential concerns of unidentified lawyers and judges and colleagues who may in the future possibly think poorly of plaintiffs meet the high bar of demonstrating reputational harm sufficient to show immediate irreparable harm.

On the record before me, the Court, I also don't find that plaintiffs' allegations of future harm, if the resolution is voted upon and passed by the union, are sufficiently actual and imminent to justify a TRO.

As noted earlier, plaintiffs argue that the resolution itself constitutes a form of compelled speech in which offensive and inflammatory statements would be

attributed to plaintiffs against their wish.

As discussed, the plaintiffs cite the Second Circuit's decision in *Evergreen* as support.  And as I noted, that case is distinguishable because it concerned a local governmental law that required pregnancy service centers to make disclosures.  It did not concern speech by a private association.

For these reasons, the record before the Court does not support a finding that defendants' dissemination of the resolution to the membership or the union's potential adoption of the resolution through a membership vote would compel plaintiffs to speak in a way that demonstrates irreparable harm.

Finally, elsewhere in their brief, and as part of their duty of fair representation claim, plaintiffs argue that the resolution itself says that organizational defunding is likely to directly follow the resolution.

The record before the Court at this time, however, doesn't demonstrate that the threat of defunding of the entities where union members work is sufficiently actual and imminent to constitute irreparable harm that would justify the issuance of a TRO.

The next prong of the analysis of a TRO concerns looking at serious questions on the merits of the claims and the balance of the hardships.

63

And on this prong, the plaintiffs do not meet the second element.  They do not show either likelihood of success on the merits of their two claims or a combination of both serious questions on the merits and the balance of hardships decidedly in their favor.

On the duty of fair representation claim, the Second Circuit has made clear that a union breaches its duty of fair representation when its conduct toward a union member is arbitrary, discriminatory. or in bad faith.  This is set forth in the Second Circuit's decision in *Vaughn vs. Air Line Pilots Association, International*, 604 F.3d 703, Second Circuit (2010).

A court's review of the allegations that a union has breached the duty of fair representation is highly deferential, quote, "recognizing the wide latitude that unions need for the effective performance of their bargaining responsibilities," close quote.  This is *Vaughan*, page 709.

Plaintiffs argue that defendants breached their duty of fair representation because the proposed resolution and the vote of the full membership on that proposal constitutes either invidious discrimination or is based on improper or irrational motives that amount to arbitrariness and bad faith.

First, I'll address whether defendants' alleged conduct was bad faith.

The Second Circuit has made clear that in the context of a duty for fair representation claim bad faith, which encompasses fraud, dishonesty, and other intentionally misleading conduct, requires proof that the union acted with an improper intent, purpose, or motive.  This is *Vaughan*, page 709 to 710.

The Second Circuit has also informed district courts that traditional indicia of bad faith include misrepresentation and concealment.  This is set forth in *Lewis vs. Tuscan Dairy Farms*, 25 F.3d 1138, Second Circuit (1994), page 1142.

On the record before the Court, plaintiffs are unlikely to succeed in demonstrating that defendants' actions, including the proposed resolution to a full membership vote, involved any misrepresentations, concealments, or any other classic indicia of bad faith.

The declaration of defendant Lisa Ohta lays out step by step the procedures followed by the union in assessing the request by a member of a certain union chapter to put the proposed resolution to a vote.  This is laid out in paragraphs 11 to 15 of the declaration.

It describes the steps taken by the union to first put the proposed resolution to a vote by the union's joint council, then to close debate on the proposal with a two-third majority of that body, and then to put the proposed

65

resolution to a vote by the full membership.

Ms. Ohta attests through her declaration that all union members had notice of the joint council meeting, had an opportunity to participate in that meeting, and that members were represented by their delegates in the joint council vote to put the proposed resolution to a full membership vote.

The parties disagree as to whether putting the resolution forward for a vote falls within the aspirational language in the union's bylaws which address the union's, quote, "principles and purposes." This is Exhibit B to the Ohta declaration located in docket No. 6-2 at page 2.

Plaintiffs argue that the resolution falls outside the union's scope of activity because it frustrates certain principles and purposes of the union.

The defendants argue the resolution falls within the union's scope of activity because it advances certain of the union's principles and purposes.

They point towards the union's purpose to advance economic, social, political, and cultural interests of our members and to advocate through political outreach the advancement of the interests of our membership, our clients, and of poor and working people in general, and to protect all members from illegal, improper, arbitrary, or discriminatory treatment.

There is this dispute between which parts of the

66

purposes and principles are most important on this issue.

But the plaintiffs haven't identified specific facts showing that the union's conduct in putting the resolution to a vote of the membership was in bad faith.

And the Court finds that this argument does not raise a serious question on the merits of plaintiffs' duty of fair representation claim.

I'll now turn to analysis of whether defendants' alleged conduct is arbitrary and is also prohibited by the duty of fair representation.

The Supreme Court has stated that a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational. This is in *Air Line Pilots Association, International vs. O'Neill*, 499 U.S. 65, page 67, (1991).

The Second Circuit stated in *Vaughan* that tactical errors or even negligence by the union are insufficient to show a breach of the duty of fair representation. This is the *Vaughan* decision at 604 F.3d at 709 to 710.

And as noted earlier, defendants assert that the union acted methodically and step by step in determining whether, when, and how to put the proposed resolution to a vote by the full membership. That is addressed, as discussed earlier, in the Ohta declaration, which lays out step by step

67

how the union assessed a request to put the resolution to a full membership vote, held a meeting of the joint council to determine whether such a vote should be held, and ensured that the joint council meeting was open to all union members to share their views.

The declaration describes how during that joint council meeting a majority of the joint council voted to put the proposed resolution to a vote by the full union membership.  That was a more than two-thirds majority of that joint council.

The plaintiffs argue that, notwithstanding the step-by-step procedures, both the resolution itself and the vote by the full membership was based on improper or irrational motives amounting to arbitrariness because of specific language, in the proposed resolution, that the Court has notice they have real and sincere beliefs, are abhorrent, one-sided, unbalanced, views on controversial and highly-contested political issues.  They describe the portions of the resolution at page 17 of their opposition brief.

On this record, however, plaintiffs don't raise a serious question on the merits of their duty of fair representation claim that putting the resolution to a membership vote was so far outside a wide range of reasonableness as to be irrational in light of the step-by-step approach the union followed and the case law on this

68

issue.

To the extent that plaintiffs's argument for improper conduct overlaps with its argument that the union violated the duty of fair representation by acting in a discriminatory way, the Court will consider that argument next.

The Second Circuit has stated that a union's acts are discriminatory when substantial evidence indicates that it engaged in discrimination that was intentional, severe, and unrelated to legitimate union objectives.  This is *Vaughan* 604 F.3d at 709 to 710.

The Supreme Court has explained that the duty of fair representation bars only invidious discrimination.  And this is in *Air Line Pilots Association* 499 U.S., at page 81.

And discrimination is invidious if it arises from prejudice or animus.  This is *Cooper vs. TWA Airlines, LLC* 274 F. Supp. 2nd 231-243 EDNY *(2003)*.

The defendants argue the union did not discriminate with respect to the benefits of membership, representation rights, or terms and conditions of work.

It is undisputed that all members of the union, including the plaintiffs, could participate in the deliberations concerning the proposed resolution and have the opportunity to vote on it on November 17th, 2023.

Citing specific parts of the resolution, plaintiffs

69

argue that the text of the resolution evinces invidious discrimination because in their view it is deeply antisemitic.

And for the purposes of resolving the defendants' motion to dissolve the TRO, again, the Court acknowledges the plaintiffs' feelings of deep, deep hurt, offense, disgust, by the content and the viewpoint of the proposed resolution.

The Court understands that plaintiffs vehemently disagree with the resolution. Those are intense and sincere feelings.

But that intensity and sincerity doesn't show that the union or the individual defendants acted with prejudice, animus, or improper motive such that they discriminated against plaintiffs by putting the resolution to a full membership vote.

The plaintiffs argue that there is evidence of discrimination by the union because in the last 45 years of its history the union has engaged in two full membership votes to speak on issues concerning Israel and Palestine and not on other topics.

They point to, and I reviewed, Exhibit A to the Clarke declaration which lists more than 25 instances of political speech by the union.

Plaintiffs argue that because most of those instances of speech were conducted by leaders of the union,

or the union's joint council, or delegate council, that the union is acting with discriminatory animus in engaging in two acts of speech on Israel and Palestine issues through full membership votes.

The record, however, shows that the union has engaged in a long history of speech on deeply controversial political issues.

And it's not the Court's place to question how the union chooses to engage in that speech, whether through a statement of the president, other union officers, or through statements by its joint council, or delegates council, or a full vote of the membership.

For all of the reasons I have covered on this record, plaintiffs don't show a serious question on the merits of their duty of fair representation claim that the union engaged in discrimination.

Part of that analysis involves looking at whether the resolution does or does not accomplish any legitimate purpose of the union. And I heard argument about the specific sentence in Article 4, Section 1.

I also heard plaintiffs' argument that certain parts of the principles and purposes section support their position that the group resolution is -- doesn't accomplish a legitimate purpose of the union.

And they point to provisions stating that the

purpose of the union is to improve the working conditions, treatment, wages, benefits, and professional standing of members, to protect all members from illegal, improper, arbitrary, or discriminatory treatment, to ensure the provision of high-quality legal services to union member clients, and to advocate for the improvement of these services in other arenas, to organize and unite the union into all workers who represent indigent clients, and to protect all members from illegal, improper and discriminatory treatment.

Defendants argue that putting the proposed resolution to a vote of the full membership does further legitimate purposes of the union pointing to provisions of the bylaws stating that the union's purpose is to advance economic, social, and political and cultural interests in union members, to advocate through political outreach for the advancement of the interests of the union membership, their clients, and of poor and working people in general, and to maintain relations with other labor organizations, and work cooperatively with other unions for the advancement of the interests of their members, their clients, and of poor and working people.

As noted, Exhibit 8 of the Clarke declaration shows that the union has engaged in speech on highly-controversial political issues, including statements on international

72

politics through statements by its leadership, joint council and delegate council.

In 1979, the union closed its accounts in South Africa in protest against that country's system of apartheid.

In 1985, the union stated to its membership that it had an historic opportunity to strengthen the movement for social justice and peace in this country, and to, quote, "turn the tide of support for apartheid and the threat of Vietnam style war in Central America," close quote.

In 1986, the union coordinated the publication of a statement in the New York Law Journal calling on leaders of the United Nations in South Africa for the release of Nelson Mandela and 11 other political prisoners in South Africa.

In 2001, the union stated to its membership that it endorsed a rally opposing changes made by the radio station WBAI's management in response to the station's coverage of September 23rd, 2001 which involved a Palestinian Right to Return March in Washington, DC.

The record thus shows that the union has spoken numerous times on highly-controversial issues of international affairs suggesting that this activity falls within the union's purpose.

And I give deference to the union in its interpretation of its bylaws as directed by the president.

Considering the record before me, I don't find that

plaintiffs have raised serious questions on the merits of their claim that putting the resolution to a vote of the membership was discriminatory conduct on the part of the union.

The last prong of the DFR claim requires showing a causal connection between the union's conduct that is alleged to be wrongful and the plaintiffs' injuries.  This is at *Vaughan* 604 F.3d at 709.

And as noted earlier, I discussed plaintiffs' arguments about personal, reputational, and professional harms, and for the same reasons that the record does not show immediate irreparable harm, for purposes of the temporary restraining order analysis, the record at this time does not demonstrate that the defendants' challenged conduct caused the three forms of harm that plaintiffs assert as required to meet what is necessary for a duty of fair representation claim.

I noted earlier as well that plaintiffs do argue that the text of the resolution shows that harm would directly follow adoption of the resolution by the union because one of the legal aid organizations at which a member of the union chapter for Bronx Defenders works was threatened with defunding after adopting a similar resolution.

But because plaintiffs have not raised questions as to the arbitrary, discriminatory, or bad faith conduct of the

union, the Court does not need to reach the question of whether the personal, reputational, and professional harms that plaintiffs allege, and which I earlier found to be insufficient for irreparable harm, would be caused by the membership's vote on the resolution.

For all of the reasons I've laid out on the record before me, plaintiffs don't raise a serious question on the merits of their duty of fair representation claim, and for that reason I do not need to reach whether plaintiffs have shown a balance of hardships to be in their favor on that claim.

I'll turn now to the breach of contract claim.

So on this claim as well, the Court finds that plaintiffs have not shown either a likelihood of success on the merits or a serious question as to the merits and the balance of hardships tipping in their favor.

Plaintiffs allege that the union and the eight individual defendants breached the union's constitution and bylaws by putting the resolution to a vote of the full membership.

The defendants argue that plaintiffs' breach of contract claim is foreclosed by New York General Association Law, and that even if plaintiffs could bring such a claim, they cannot establish either an enforceable promise or damages caused by the breach. This is at defendants' brief

pages 12 to 13.

First, I turn to the contract claim against the union itself.

The Court finds that plaintiffs are precluded from bringing this claim because they are unable to show that every union member authorized or ratified the challenged conduct.

Plaintiffs' breach of contract claim is a state claim governed by New York State Law, and the New York Court of Appeals has held that under Section 13 of the New York General Associations Law in order to sue a voluntary, unincorporated association, like a private labor union, the plaintiffs must show that each individual union member authorized or ratified the action at issue.

The New York Court of Appeals first analyzed this rule in *Martin vs. Curran*, 303 New York 276, 1951 decision.

It affirmed this principle again in 2014 in *Palladino vs. CNY Centro, Incorporated*, a case where a union member brought, among other claims, a breach of contract claim against a union.  This is at 23 New York 3d 140 (2014).

The Court in *Palladino* recognized that its decision in *Madden vs. Atkins*, at 4 New York 2nd 238, 1958, the Court had created a narrow exception to the *Martin vs. Curran* rule.

In *Madden*, a former union member brought a claim challenging his wrongful expulsion from the union.

And the New York Court of Appeals made clear in *Palladino*, a later decision, that the *Martin vs. Curran* rule is inapplicable to a suit by a union member against a union arising from wrongful expulsion.

The plaintiffs argue that the *Madden* exception applies here permitting the breach of contract claim against the union. Their argument is based on the fact that in *Madden* the wrongful expulsion that was challenged through the breach of contract claim was enacted through a vote of the union membership.

Applying New York State Law, this court finds that the exception to the *Martin* rule set forth in *Madden* does not apply here.

As an initial matter, the plaintiffs read *Madden* very broadly to include a general exception for breach of contract claims against a union taken as a result of a union vote.

But at this time, the Court need not determine how far that *Madden* exception reaches.

In this case, the union's membership has not yet voted to authorize the proposed resolution that plaintiffs challenge. Indeed, the very TRO at issue today stops the vote while it was in progress. This is set forth in the Ohta declaration, paragraphs 17 to 20.

And based on my review of the case law and the

record, the Court finds that plaintiffs have not shown that every individual union member authorized or ratified the action at issue as required under *Martin,* and Section 13 of the New York General Associations Law.

On the contrary, numerous pieces of evidence in the record show that the decision of the union's joint council to place the proposed resolution on a ballot for a full membership vote was not unanimous.  This is in paragraph 15 of the Ohta declaration, and Exhibit 2 of Daniel Khan's declaration as well.

For all of these reasons, plaintiffs have not shown that they're likely to succeed on the merits or that they've raised a serious question on the merits of their breach of contract claim against the union.

I now turn to plaintiffs' breach of contract claim against the eight individual defendants.

Plaintiffs argue that even if the *Martin* rule bars a breach of contract claim against the union, it doesn't bar this claim.

They argue that these claims are brought against the individual defendants in their individual capacities, not their official capacities as officers of the union.

The verified complaint, however, does not plead with specificity what actions each of the individual defendants took in their individual capacities that breached

any specific terms of the United Auto Workers Constitution or the union's bylaws.

And to reach this conclusion, I reviewed paragraphs 4, 16 and 25 of the verified complaint as well as other allegations.

The verified complaint alleges that the individual defendants named herein have plans to imminently cause a vote to be scheduled and held on Friday, November 17th, 2023, whereby they seek the adoption of the proposed resolution.

The verified complaint alleges the names of each individual defendant and the role they play in the leadership of the union.  It also alleges generally that the individual defendants have breached the promises in the union contract and, quote, "imminently will continue to breach those promises."

But the verified complaint does not plead with specificity what any of the eight individual defendants did to imminently cause a vote to be scheduled or held on the resolution.

None of the affidavits or exhibits submitted by plaintiffs in opposition to the motion to dissolve fill in the gaps.

So there are questions about whether plaintiffs have stated a claim against any of the individual defendants for breach of any specific provision of the contract at issue

which according to the plaintiffs is the UAW Constitution and the union bylaws.

So given the paucity of these allegations against the individual defendants, the plaintiffs have not shown a likelihood of success on the merits, or raised a serious question on the merits of their breach of contract claim against the eight individual defendants as required for the issuance of a TRO.

And because they have not raised serious questions on the merits of their breach of contract claim, I don't need to reach whether plaintiffs have showed that the balance of hardships tips in their favor on this claim.

So for the reasons that I have addressed, including my review of the entire record and the case law, I grant defendants' motion to dissolve the TRO.

With that, I understand that in their opposition brief plaintiffs identified a request for a preliminary injunction.

And I'm prepared to work with the parties to determine an appropriate briefing and hearing schedule on that preliminary injunction.

I'll ask counsel do you want to propose dates, or would you like to meet and confer to come up with a set of agreed-upon dates?

MS. RAISNER:  Yes.  We'd like to meet and confer.

80

THE COURT:  Okay.  Would you like to -- like me to give you a ten-minute break because you're all here and can do that, or would you like to submit something in writing to me by Monday or Tuesday?

MS. BELOVIN:  Why don't we do that by Monday or Tuesday if that's okay, Your Honor.

THE COURT:  Okay.  Absolutely.

Anything further from either of the parties, either sets of parties?

MS. RAISNER:  No, Your Honor.

MR. FELSTINER:  No, Your Honor.

THE COURT:  Okay.  I want to thank counsel for their advocacy in this case, for their hard work on the briefs and submissions.  I did read everything that people gave me.

And I thank the parties for their attendance here in this court of law as we resolve the issues in the motion that was before the Court today.  I very much appreciate your respect and courtesy towards each other and to the Court.  I hope everybody has a good weekend.  Thank you very much.

ALL COUNSEL:  Thank you, Your Honor.

(Proceedings concluded at 3:24 p.m.)

81

I, CHRISTINE FIORE, court-approved transcriber and certified electronic reporter and transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Christine Fiore*

December 22, 2023

_____

Christine Fiore, CERT